**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PHILIP HUTCHISON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CBRE REALTY FINANCE, INC., RAY WIRTA, KEITH GOLLENBERG, and MICHAEL ANGERTHAL,<br><br>Defendants. | Civil Action No. 3:07-cv-01599 (SRU)<br><br>September 15, 2009 |

**MEMORANDUM OF LAW OF DEFENDANTS CBRE REALTY FINANCE, INC. (N/K/A REALTY FINANCE CORPORATION), RAY WIRTA, KEITH GOLLENBERG, AND MICHAEL ANGERTHAL IN OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S ORDER, DATED JULY 29, 2009**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

SUMMARY OF RELEVANT FACTS ....................3

A. The February 26, 2007 Press Release: The Triton-Related Disclosures Appear to Have Had Little Impact on CBRE's Stock Price, as Plaintiffs Themselves Previously Argued .................... 3

B. The May 7, 2007 Press Release: CBRE Disclosed that the Triton Loans Were in Foreclosure but Fully Secured, and the Market Did Not React .................... 6

C. The August 6, 2007 Press Release: Contrary to Plaintiffs' Assertion, There Was No Disclosure that the Rodgers Forge Loan Was "Non-Earning" .................... 7

SUMMARY OF RELEVANT PROCEEDINGS TO DATE ....................8

A. The "Collateral Shortfall" Issue Was Prominent in Connection with Defendants' Motions to Dismiss.................... 8

1. Defendants' Motion to Dismiss the Corrected Complaint.................... 8

2. Defendants' Motion to Dismiss the Complaint .................... 10

B. The Parties' Additional Submissions.................... 11

C. The Court's July 29 Decision .................... 12

ARGUMENT....................12

I. THE MOTION FOR RECONSIDERATION SHOULD BE DENIED .................... 12

A. The Standard of Review.................... 12

B. There is No Basis For Reconsideration Here.................... 13

C. In Any Event, Plaintiffs' New Argument Lacks Merit.................... 14

1. Plaintiffs Here Failed to Plead Quantitative Materiality.................... 16

2. Plaintiffs Here Failed to Plead Qualitative Materiality.................... 17

3. Pre-*ECA* Case Law Also Demonstrates That Plaintiffs' New Argument Lacks Merit.................... 18

**TABLE OF CONTENTS**
**(cont'd)**

II. THE COURT SHOULD DENY LEAVE TO FILE A THIRD AMENDED COMPLAINT ........ 20

A. The Standard of Review ........ 20

B. Plaintiffs Unduly Delayed Seeking Leave to Amend ........ 21

C. The Proposed Amendment Is Futile ........ 22

1. The New "Materiality" Allegations are Insufficient ........ 22

2. The New Allegations Regarding the Maryland Action are Insufficient ........ 23

3. The PTAC Contains Allegations Lacking a Good Faith Basis ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Atronic Int'l, GMBH v. Sai Semispecialists of Am., Inc.*,
2007 WL 2493482 (E.D.N.Y. Aug. 29, 2007)....................6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................16

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007)....................3, 20, 22

*Caiafa v. Sea Containers, Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)....................16

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*
("*ECA*"), 553 F.3d 187 (2d Cir. 2009).................... *passim*

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)....................15, 17

*Gavish v. Revlon*,
2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)....................16

*Halperin v. ebanker USA.Com, Inc.*,
295 F.3d 352 (2d Cir. 2002)....................19

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983)....................20

*In re Allied Capital Corp. Sec. Litig.*,
2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)....................18

*In re Duke Energy Corp. Sec. Litig.*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003)....................18

*In re Fuwei Films Sec. Litig.*,
2009 WL 2005291 (S.D.N.Y. July 10, 2009)....................17

*In re Keegan Mgt. Co. Sec. Litig.*,
794 F. Supp. 939 (N.D. Cal. 1992)....................20

*In re The Ultimate Corp. Sec. Litig.*,
1989 WL 86961 (S.D.N.Y. July 31, 1989)....................20

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)....17, 18

*Levine v. NL Indus., Inc.*,
926 F.2d 199 (2d Cir. 1991)....14, 19

*Lin v. Interactive Brokers Group, Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008)....10

*Madeira v. United Talmudical Academy of Kiryas Joel*,
351 F. Supp. 2d 162 (S.D.N.Y. 2004)....6

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007)....20

*Milman v. Box Hill Systems Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999)....10

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)....10

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) ....17, 18

*Polsby v. St. Martin's Press, Inc.*,
2000 WL 98057 (S.D.N.Y. Jan. 18, 2000) ....13

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....23

*Silver v. H&R Block, Inc.*,
105 F.3d 394 (8th Cir. 1997) ....18

*State Trading Corp. of India v. Assuranceforeningen Skuld*,
921 F.2d 409 (2d Cir. 1990)....22

*VIP of Berlin, LLC v. Town of Berlin*,
2009 WL 1927350 (D. Conn. July 8, 2009) ....12, 13, 14

**STATUTES**

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k.... *passim*

Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) .... *passim*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

**OTHER AUTHORITIES**

17 C.F.R. § 210.4-01(a)(1)....................9

17 C.F.R. § 229.303....................10

17 C.F.R. § 229.503....................10

Fed. R. Civ. P. 9(b)....................23

Fed. R. Civ. P. 12(b)(6)....................9, 14

Fed. R. Civ. P. 15....................3, 20, 22

FASB Statement of Financial Accounting Standards No. 114....................3, 14

*SEC Staff Accounting Bulletin* No. 99, 64 Fed. Reg. 45150 (1999)....................14, 15, 16, 17

Defendants CBRE Realty Finance, Inc. (n/k/a Realty Finance Corporation) ("CBRE"), Ray Wirta, Keith Gollenberg, and Michael Angerthal respectfully submit this memorandum of law in opposition to plaintiffs' Motion for Reconsideration of the Court's Order, Dated July 29, 2009. In their memorandum of law, plaintiffs alternatively seek leave to file a Third Amended Complaint. For the reasons set forth below, the Court should deny both reconsideration and leave to file another amended complaint.

**PRELIMINARY STATEMENT**

The motion for reconsideration is a misguided effort to relitigate the issue of materiality. Plaintiffs rely on a meritless argument they could have made, but failed to make, earlier – i.e., that CBRE's February 27, 2007 and August 7, 2007 stock price declines occurred "even though the loans were purportedly collateralized." Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration ("Pl. Mem.") at 2.

Aside from coming too late, plaintiffs' new theory fails because merely alleging a stock price decline in response to a "corrective" disclosure does not adequately plead materiality. This legal principle was recently reaffirmed by the Second Circuit in a case plaintiffs fail to cite, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ("*ECA*"). *ECA*, like this case, involved allegations that loans were improperly reported on the corporate defendant's financial statements. In *ECA*, as in this case, plaintiffs alleged a significant (19%) stock price decline in response to an allegedly corrective disclosure. Yet in *ECA*, consistent with this Court's dismissal of the Second Amended Complaint ("Complaint"), the Second Circuit held that materiality was not adequately pled.

Plaintiffs' memorandum conspicuously omits any discussion of the record facts that put the February and August stock price declines in proper context. As a result, it conveys the

impression that developments related to Triton prompted, and were the focus of, the press releases that preceded the declines. In fact, the releases were not issued for any reason related to Triton, but as part of CBRE's normal quarterly financial reporting process. Moreover, the releases disclosed important financial and other information having nothing to do with Triton. As discussed below, for these reasons and others, plaintiffs' hypothesis that Triton-related disclosures caused the stock price declines is, at best, highly speculative. Thus, this case is a prime example of why courts will not infer materiality based on stock price declines alone.

In addition to ignoring contextual facts and relevant case law, plaintiffs' memorandum misstates or omits important aspects of the prior proceedings herein, underscoring the motion's lack of both merit and credibility. For example:

- Plaintiffs contend that *the Court* "overlooked" that CBRE's stock price declined in February and August 2007 even though the Triton-related disclosures in the press releases indicated that CBRE was fully collateralized. In truth, *plaintiffs* overlooked this meritless argument. Nowhere in their numerous prior submissions, or during either of two lengthy oral arguments before the Court, did plaintiffs argue that references to CBRE's collateral in the February or August 2007 releases somehow showed materiality.

- Plaintiffs' new argument is directly contradicted by their prior argument that the Triton-related disclosures in the February press release were *not* material to investors because, among other reasons, investors took "comfort" from CBRE's fully collateralized status. Although plaintiffs now argue that investors were indifferent to CBRE's fully secured position regarding the Triton Loans, plaintiffs do not so much as acknowledge, much less seek to explain, their prior inconsistent position.

- It is not true, as plaintiffs contend, that CBRE disclosed in the August 6, 2007 press release that Rodgers Forge was "non-earning." Pl. Mem. at 2. Not only does the release not say that, but CBRE disclosed *three months earlier*, in a May 7, 2007 press release that plaintiffs relied on previously but now fail to mention, that Rodgers Forge was in default and that foreclosure had begun. (Notably, CBRE's stock price did not move after *that* disclosure, which was coupled with a disclosure that CBRE remained fully secured on the Triton Loans.)

- Plaintiffs contend that the Court may have been "led astray by [d]efendants' continued mischaracterizations of the Complaint as being about CBRE's

> failure to disclose that the Triton Loans were impaired." In truth, defendants (and presumably the Court) were guided by plaintiffs' own Complaint and briefs, which unequivocally asserted that the interim financial statements in the IPO prospectus violated GAAP by, among other things, negligently failing to recognize an impairment of the Triton Loans. Indeed, plaintiffs' conclusory assertions that the Triton Loans were unlikely to be paid, and that the collateral was insufficient, are, in effect, arguments that an impairment existed. *See* FASB Statement of Financial Accounting Standards No. 114.

For the foregoing and other reasons discussed below, reconsideration should be denied. Additionally, the Court should deny plaintiffs' request for leave to file a Third Amended Complaint. Where, as here, a request for leave to amend is delayed until after judgment, a court may exercise its discretion "more exactingly," and the liberal amendment policy embodied in Federal Rule of Civil Procedure 15 may readily give way to the "competing interest of protecting the finality of judgments and the expeditious termination of litigation." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (internal quotation omitted). Moreover, the Court should deny leave to file another amended complaint on futility grounds, as plaintiffs' proposed pleading, like the one the Court dismissed, fails to allege facts plausibly showing materiality.

## SUMMARY OF RELEVANT FACTS

### A. The February 26, 2007 Press Release: The Triton-Related Disclosures Appear to Have Had Little Impact on CBRE's Stock Price, as Plaintiffs Themselves Previously Argued

Approximately five months after its IPO, CBRE issued its February 26, 2007 press release announcing the Company's fourth quarter and full year financial results for 2006. Ex. A (press release, 2/26/07).[1] The sole reference to the Triton Loans in the 10-page release was on page 3, after a discussion of earnings and dividend guidance that fell short of Wall Street

[1] Documents referred to herein and attached as exhibits to the accompanying Declaration of Robert S. Fischler ("Fischler Decl.") are cited herein as "Ex. __."

expectations. *Id.* at 3.[2] The Triton-related disclosures were that a $31.8 million loan was "non-performing" and that a $19.7 million loan had been placed on a "watch list." *Id.* The release added that the "Company has had no impairments or loss reserves since inception" and that the "collateral values . . . exceed all of the debt and accrued interest [on the Triton Loans]." *Id.* The financial statements contained in the release showed that CBRE, which was in the business of making loans and other real estate investments, had assets exceeding *$1.5 billion*. *Id.* at 7.

On February 27, 2007, U.S. stock markets declined,[3] and CBRE's stock price fell from $15.94 per share (closing price on February 26) to $13.10 per share (closing price on February 27), or 17.82%. Ex. E at 5 (Yahoo Finance stock prices). Plaintiffs, who give the impression that the *only* disclosures on February 26 concerned the Triton Loans, assert that the entire price decline was "[i]n response to" the Triton disclosures. Pl. Mem. at 2. But that speculation is highly doubtful. Among other things, the disappointing earnings and guidance numbers in the February 26 release, the small size of the Triton Loans relative to CBRE's total assets, the fact that no loss had been recorded on either Triton Loan, and the overall volatility in U.S. stock markets on February 27 suggest that investors reacted to events unrelated to Triton. Of course, this conclusion is further suggested by the fact that the February 26 release disclosed that the Triton Loans were fully secured.

Indeed, contrary to what they now say, plaintiffs themselves previously argued that CBRE's fully secured status would have alleviated any investor concerns regarding the Triton

---

[2] *See, e.g.*, Ex. B (February 27, 2007 Credit Suisse Report) (downgrading CBRE based on a variety of factors, including the announcement that Q4 2006 had higher than anticipated expenses, and that earnings were lower than expected); Ex. C (February 28, 2007 Oppenheimer & Co. Report) (stating that the decline in share price resulted from a combination of issues, including lower than expected earnings, below consensus guidance, and credit issues).

[3] *See, e.g.*, Ex. D (Tim Annett, *The Evening Wrap: From Bad to Worse*, THE WALL STREET JOURNAL, Feb. 27, 2007) (discussing that the Dow Jones Industrial Average closed down 416 points, or 3.3%, having suffered even larger intraday declines).

Loans. Plaintiffs' prior argument was made in opposition to a motion filed by the underwriter defendants that have been dismissed from this case (the "Underwriters' Motion").[4] The underwriters sought dismissal primarily on the ground that plaintiffs' claims were time-barred, contending that the Triton-related disclosures on February 26 put plaintiffs on "inquiry notice" of their claims sufficient to start the running of the statute of limitations.

Plaintiffs argued in opposition that investors were not on inquiry notice because no impairment of the Triton Loans had been disclosed on February 26, and that the statements in the press release concerning the lack of an impairment – given that CBRE was fully secured – "constituted '*reliable words of comfort*' . . . on which investors 'would reasonably rely'. . . ." Ex. F at 11 (Mem. of Law, 9/19/08) (emphasis added). As a result, plaintiffs argued, the stock price decline on February 27 was "modest" and "insignificant in comparison to the [price decline] following CBRE's announcement on August 6, 2007, which finally recognized that the value of the mezzanine loans to Triton had become impaired . . . ." *Id.*

At oral argument, plaintiffs continued to minimize the importance of the Triton disclosures in view of the collateral that secured the Triton Loans. Specifically, plaintiffs argued that "impairment . . . was not announced by [CBRE] until months later," and that in February "[CBRE] actually came out and submitted an affirmative statement that *the collateral was in excess of book value of that loan, so the company came out and affirmatively stated those loans were not impaired*." Ex. G at 41, 43-44 (Tr., 11/14/08) (emphasis added).

In short, plaintiffs previously asserted to this Court that the Triton-related disclosures in the February press release were *not* material to investors because there was no "impairment" of

[4] The Corrected Complaint filed on May 6, 2008 included as defendants the securities firms that underwrote CBRE's IPO in September 2006. The underwriters were voluntarily dismissed by plaintiffs in December 2008.

the Triton Loans given the value of CBRE's collateral. Now plaintiffs urge just the opposite – contending that the Triton-related disclosures caused investors to sell CBRE stock despite the fact that the Triton loan was fully secured. For the reasons discussed above, it appears that plaintiffs were right the first time.[5]

**B. The May 7, 2007 Press Release: CBRE Disclosed That the Triton Loans Were in Foreclosure but Fully Secured, and the Market Did Not React**

On May 7, 2007, CBRE issued a press release announcing its first quarter 2007 financial results. Ex. H (press release, 5/7/07). The release contained new disclosures concerning the Triton Loans, including the negative developments that CBRE was expending millions of dollars to cure defaults on the senior loans on both projects, and that the Company had foreclosed on the asset (Rodgers Forge) that CBRE had revealed in the February release to be on a "watch list." *Id.* at 3. In other words, CBRE disclosed on May 7 that the Rodgers Forge loan was no longer being "watched" for possible default, and that Triton had actually defaulted and that CBRE had foreclosed. CBRE also disclosed that it was in the process of foreclosing on the "non-performing" Monterey loan. CBRE again stated in the May 7 release that it believed that the collateral securing each of the Triton Loans was "in excess of the book value for this asset." *Id.*

Notably, there was virtually no movement in the price of CBRE's stock in response to the May 7 release. Rather, on May 8, 2007, the market price of CBRE's stock remained stable,

---

[5] Plaintiffs' about-face, without even so much as acknowledging their prior argument, demonstrates that plaintiffs' arguments are driven first and foremost by expediency, and are made with little regard for the processes of the Court. Courts will not countenance this type of gamesmanship. *See Atronic Int'l, GMBH v. Sai Semispecialists of Am., Inc.*, 2007 WL 2493482, at *6 n.1 (E.D.N.Y. Aug. 29, 2007) (rejecting plaintiff's motion for reconsideration in part because plaintiff advanced a new argument that contradicted the stance plaintiff took on the issue earlier in the case); *see also Madeira v. United Talmudical Academy of Kiryas Joel*, 351 F. Supp. 2d 162, 164-65 (S.D.N.Y. 2004) (recognizing in judicial estoppel context that courts should be concerned with "preventing a party from playing fast and loose with the court" by asserting inconsistent positions).

closing down $.05 (at $12.91) from its May 7 closing price. Ex. E at 3. Three days later, on May 11, 2007, the stock closed at $13.09, *above* its May 7 closing price. *Id.*

In their opposition to the Underwriters' Motion, plaintiffs relied upon the May 7 press release, asserting that it contained the first disclosures regarding the Triton Loans that were important enough to have arguably triggered inquiry notice. Ex. F. at 7-8. Yet they now ignore the May 7 release, presumably because the absence of any stock price movement after the May 7 disclosures, including that CBRE remained fully secured, directly undercuts plaintiffs' position on this motion.

**C. The August 6, 2007 Press Release: Contrary to Plaintiffs' Assertion, There Was No Disclosure that the Rodgers Forge Loan Was "Non-Earning"**

On August 6, 2007, CBRE issued a press release announcing its second quarter 2007 financial results. Ex. I (press release, 8/6/07). The first page of the release disclosed that "[t]he Company recognized a $7.8 million non-cash impairment on one of the two foreclosed assets that the Company gained control of through foreclosure during the quarter." *Id.* at 1. Pages 3-4 of the release provided additional details on the foreclosed assets, including that the impairment was taken on the Monterey loan, and that the Company's "carrying value" on the Rodgers Forge loan "was $22.9 million." *Id.* at 3-4.

By August 6, 2007, the credit markets were in turmoil, and the CBRE press release that day disclosed a number of negative developments having nothing to do with Triton. First, the release disclosed that "[g]iven the recent volatility in the capital markets, the Company has halted making new investments in the near-term." *Id.* at 4. Second, CBRE disclosed that, in light of falling property values, its principal lender, Wachovia, had issued a margin call that required CBRE to post additional security for its outstanding borrowings. *Id.* And third, the

release revealed that, due to "current uncertainty in the lending environment," the Company was reducing its previously announced dividend guidance. *Id.* at 5.

On August 7, 2007, CBRE's stock price fell by $1.96, a percentage decline of 31.56% over its August 6 closing price. Ex. E at 1. The decline was short-lived, however, as CBRE's share price closed above its August 6 closing price on August 22. *Id.*

Plaintiffs ignore the August 6 disclosures detailed above. Instead, they assert that a disclosure in the press release that Rodgers Forge was "non-earning" moved the market on August 7. Pl. Mem. at 6. This is not a credible argument for at least two reasons. First, there was *no disclosure* on August 6 that Rodgers Forge was "non-earning." Rather, as discussed above, and as plaintiffs highlighted in opposition to the Underwriters' Motion, CBRE had already disclosed three months earlier, in its May 7 press release, that it had foreclosed on the Rodgers Forge loan. Second, given the quantitative insignificance of the $19 million Rodgers Forge loan in the context of investment assets that then exceeded $2 billion,[6] it is implausible that investors would have sold CBRE stock because the Rodgers Forge loan was "non-earning."

## SUMMARY OF RELEVANT PROCEEDINGS TO DATE

### A. The "Collateral Shortfall" Issue Was Prominent in Connection with Defendants' Motions to Dismiss

#### 1. Defendants' Motion to Dismiss the Corrected Complaint

Plaintiffs filed their initial complaint against CBRE and two of the individual defendants on October 30, 2007. On March 25, 2008, they filed an amended complaint. On May 6, 2008, plaintiffs filed their third complaint, the "Corrected Complaint." Like its predecessors, the Corrected Complaint purported to be brought on behalf of a class of shareholders who bought

[6] The August 6 press release stated that as of June 30, 2007, CBRE's overall investment portfolio had increased to $2 billion. Ex. I at 3.

CBRE stock between September 2006 (the date of CBRE's IPO) and August 6, 2007, the date on which CBRE issued its press release announcing its second quarter financial results and the $7.8 million impairment allowance on the Monterey loan. Corr. Compl. ¶ 1.

The gravamen of the Corrected Complaint was the allegation that CBRE, in violation of generally accepted accounting principles ("GAAP") and Sections 11 and 12(a)(2) of the Securities Act, "negligently and improperly" failed to record an impairment allowance in the interim financial statements contained in the IPO prospectus. Corr. Compl. ¶¶ 61, 81-83. The plaintiffs alleged that, under SEC regulations that govern the content of registration statements, the GAAP violations rendered the prospectus presumptively misleading. *Id.* ¶ 85.[7]

On July 29, 2008, CBRE and the individual defendants (two former CBRE officers and a director of the Company) moved to dismiss pursuant to Rule 12(b)(6). On the issue of materiality, defendants argued, in part, that plaintiffs failed to allege facts plausibly showing that the value of CBRE's collateral securing the Triton Loans was materially less than the amount of the loans. In their opposing memorandum, plaintiffs' discussion of materiality consisted of a conclusory footnote that made no mention of CBRE's collateral or any disclosures related thereto. Ex. J at 13 n.4 (Mem. of Law, 9/19/08).

At oral argument on November 14, 2008, the "collateral shortfall" issue was addressed. In questioning plaintiffs' counsel, the Court signaled its view that materiality may be lacking given the absence of alleged facts showing a collateral shortfall. Ex. G at 28-29 ("Have you alleged anything about the value of the collateral? In other words . . . [l]et's assume you've got $50 million of bad loans; if they have $100 million in collateral, so what?"). Plaintiffs' counsel

[7] The SEC requires that financial statements be reported in accordance with GAAP. Under SEC Regulation S-X, a financial statement that does not conform to GAAP is considered presumptively misleading or inaccurate. 17 C.F.R. §210.4-01(a)(1). Plaintiffs relied on GAAP and the Regulation S-X presumption in the Complaint, and continue to do so in the proposed Third Amended Complaint.

acknowledged that plaintiffs were required to plead a collateral shortfall, *id.* at 30, and never suggested that plaintiffs had met their burden of pleading materiality based on any reference to CBRE's collateral in the February 26 or August 6, 2007 press releases.

At the conclusion of argument, the Court stated that it believed that the defendants' arguments had more merit than the Court had previously appreciated, and that the Court wanted to "give the plaintiffs a chance to provide their best shot in the next complaint." *Id.* at 46-47. The Court dismissed the section 12(a)(2) claim without prejudice, and deferred ruling on the remainder of the motion to dismiss pending the filing of a second amended complaint. *Id.*

**2. <u>Defendants' Motion to Dismiss the Complaint</u>**

On December 22, 2008, plaintiffs filed the Complaint. As the Court later observed, this amended pleading made only minor changes regarding the "pertinent issues." Ex. K at 2 (Tr., 4/17/09). Like its predecessor, the Complaint alleged that the interim financial statements in the prospectus were misleading because, contrary to GAAP, they failed to record an impairment allowance on the Triton Loans. Compl. ¶¶ 98-99. It further alleged that CBRE had a duty to disclose problems with the Triton Loans arising under Items 303 and 503 of SEC Regulation S-K, 17 C.F.R. §§ 229.303, 229.503. *Id.* ¶¶ 102-12.[8] Significantly, the Complaint did not add a single new allegation concerning the value of CBRE's collateral at the time of the IPO, and made no mention of references to its collateral in the February or August press release.

---

[8] In order to maintain a claim for failure to disclose information pursuant to Section 11, a plaintiff must demonstrate, among other things, "that the defendant had an affirmative duty to disclose the information . . . ." *Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220, 227 (S.D.N.Y. 1999). *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008). In the Complaint and earlier versions thereof, plaintiffs alleged an affirmative duty to disclose under GAAP and Items 303 and 503 of SEC Regulation S-K. *See Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416-17 (S.D.N.Y. 2008) ("The duty of disclosure in offering documents stems from regulations set forth by the SEC pursuant to its authority under the 1933 Act.").

Defendants moved to dismiss the Complaint on January 15, 2009, again arguing that plaintiffs alleged no facts plausibly showing a collateral value shortfall at the IPO effective date. Defendants pointed out that, absent such allegations, the estimated loss from the Triton Loans at the time of the IPO, even assuming the likelihood of a Triton payment default, would have been *zero*. In their opposition memorandum, plaintiffs offered no argument relating to disclosures concerning CBRE's collateral.

At oral argument on April 17, 2009, the Court focused on the materiality issue, asking plaintiffs' counsel if plaintiffs were required to demonstrate that "there was not collateral in excess of $51 million to cover the loans in the event that the loans had to be foreclosed[?]" Ex. K at 24-25. In response, counsel's arguments did not include any reference to CBRE's disclosures of its collateralized status in the February and August press releases. At the conclusion of argument, the Court reserved decision.

**B. <u>The Parties' Additional Submissions</u>**

Subsequent to oral argument, both parties sent letters to the Court concerning whether a disclosure obligation could arise under GAAP or Items 303 and 503 if the registrant neither knew nor should have known of the omitted information. In addition, plaintiffs sent the Court a letter on May 18, 2009 regarding a counterclaim asserted by Triton's principals in a lawsuit filed in Maryland by CBRE to collect on payment guarantees issued by those principals (the "Maryland Action"). Ex. L (letter, 5/18/09). The letter did not ask for leave to amend the Complaint, and plaintiffs filed no motion for leave to amend.

In response to plaintiffs' letter, defendants pointed out that the guarantors' counterclaim had been dismissed on motion by the Maryland court. Defendants further argued that in deciding defendants' motion to dismiss, this Court could not properly consider allegations in another case

that were not contained in the Complaint herein. Ex. M (letter, 5/20/09). Plaintiffs still did not seek leave to amend the Complaint.

### C. The Court's July 29 Decision

On July 29, 2009, this Court issued its decision (the "Decision") granting defendants' motion to dismiss and directing the Clerk of the Court to close the file of the case. The Court determined that the Complaint was fatally deficient because it failed to allege facts plausibly showing that the collateral securing CBRE's loans was worth less than the loan amounts at the time of the IPO. Accordingly, the Court held that plaintiffs had failed to meet their burden of pleading materiality.

On August 11, 2009, the Clerk of the Court signed a judgment dismissing this action and closing the file, which was entered August 12. Later on August 12, plaintiffs filed the instant motion.

## ARGUMENT

## I. THE MOTION FOR RECONSIDERATION SHOULD BE DENIED

### A. The Standard of Review

As this Court recently explained in *VIP of Berlin, LLC v. Town of Berlin*, 2009 WL 1927350 (D. Conn. July 8, 2009):

> The standard for granting motions for reconsideration is strict; motions for reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court. Motions for reconsideration will not be granted where the party merely seeks to relitigate an issue that has already been decided. The three major grounds for granting a motion for reconsideration in the Second Circuit are: (1) an intervening change of controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice.

*Id.* at *13 (internal quotation and citation omitted). On a motion for reconsideration, a party may not "advance new facts, issues or arguments not previously presented to the Court." *Polsby v. St. Martin's Press, Inc.*, 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (internal quotation omitted).

**B. <u>There is No Basis For Reconsideration Here</u>**

Plaintiffs' motion for reconsideration must fail because it is an attempt to relitigate an issue that was decided after full vetting in the parties' briefs on two motions to dismiss and during two oral arguments before the Court. In addition, plaintiffs improperly seek to advance a new argument not previously presented to the Court. For these reasons alone, the motion should be denied.

In attempting to fit within the standards governing their motion, plaintiffs assert that the Court "overlooked" that CBRE's stock price dropped in February and August 2007, even though "the Triton Loans were fully collateralized." Pl. Mem. at 2. But the Court did not "overlook" this argument – the plaintiffs did. Indeed, despite the prominence of the "collateral shortfall" issue throughout the briefing and oral arguments on defendants' two motions to dismiss, nowhere in any prior brief filed by plaintiffs, or during either oral argument, did plaintiffs ever suggest that the February and August disclosures regarding CBRE's collateral supported a finding of materiality. *See* pages 8-11, *supra*. Moreover, there was no allegation in the Complaint that the February or August disclosures included references to CBRE's fully collateralized status, much less that such references showed materiality. Thus, plaintiffs' further contention that the Court "overlooked these allegations," Pl. Mem. at 2, is also baseless.

Nor, as discussed further below, does the new argument advanced by plaintiffs rely on data that should "alter the conclusion reached by the court," and no showing has been made that there is any "need to correct a clear error or prevent manifest injustice." *VIP of Berlin*, 2009 WL

1927350, at *13 (internal quotation omitted). Indeed, it is clear that the Court's initial conclusion was correct – materiality was not plausibly alleged in view of the Complaint's failure to allege facts showing a shortfall in CBRE's collateral at the time of the IPO. *See Levine v. NL Indus., Inc.*, 926 F.2d 199, 203 (2d Cir. 1991).[9]

**C. <u>In Any Event, Plaintiffs' New Argument Lacks Merit</u>**

Even if the Court were to reconsider, it should adhere to its initial decision because the plaintiffs' new argument lacks merit. For one thing, in this circuit, allegations of stock price declines after a "corrective" disclosure, without more, are not sufficient to plead materiality. *ECA*, 553 F.3d at 205.

In *ECA*, plaintiff shareholders sued JP Morgan Chase & Co. ("JPMC"), alleging violations of Sections 11 and 15 of the Securities Act, and of Section 10(b) of the Securities Exchange Act. 553 F.3d at 194-95. Plaintiffs asserted, among other things, that JPMC's financial statements violated GAAP by reporting the so-called "Mahonia" transactions with Enron Corporation as viable trades rather than impaired loans. *Id.* at 195, 199. The district court dismissed the complaint under Rule 12(b)(6) on materiality and other grounds. On appeal, the Second Circuit, relying on *SEC Staff Accounting Bulletin* ("SAB") No. 99, 64 Fed. Reg. 45150, 45150-52 (1999), explained that "quantitative materiality" (i.e., financial magnitude) is an

[9] *Levine* is directly analogous to this case, and confirms the correctness of this Court's conclusion that it is implausible that CBRE investors would have viewed additional information concerning a possible Triton default as significant. In *Levine*, a class action alleging securities fraud, the Second Circuit held that the corporate defendant's failure to disclose environmental law violations was immaterial because a third party had agreed to indemnify the defendant against loss arising from such violations. As reasoned by the court, "[u]nder these circumstances. . ., there was no plausible way that NL's shareholders could suffer financially from the consequences of the alleged environmental violations." 926 F.2d at 203. Thus, in *Levine*, as here, the omission was immaterial because the defendant was secured against financial loss in connection with the subject matter of the omission. The conclusion that plaintiffs here failed to plead materiality is further supported by GAAP, under which a lender need not record an impairment allowance unless the collateral value is below the carrying value of the loan. FASB Statement of Financial Accounting Standards No. 114.

important factor, but factors that might demonstrate "qualitative materiality" must also be considered. *ECA*, 553 F.3d at 204-05.[10]

As to quantitative materiality, the court endorsed the SEC's view that a misstatement or omission involving a deviation of less than five percent is presumptively immaterial. *Id.* at 204. Given that the alleged misstatement in *ECA* involved less than one-third of a percent of JPMC's total assets, the court held that quantitative materiality was not adequately pled. *Id.* The court went on to examine the three qualitative factors argued by the plaintiffs, including the "nearly nineteen percent" drop in JPMC's stock price upon disclosure of the alleged misstatement to the market. *Id.* at 203. Notwithstanding this significant drop in price, the Second Circuit held that the market's reaction did not "point towards qualitative materiality," explaining that:

> SAB No. 99, while alluding to market reactions as a valid consideration in analyzing materiality, warned that market volatility alone is "too blunt an instrument to be depended on in considering whether a fact is material." Indeed, SAB No. 99 limits the usefulness of this factor *to instances where management expects "that a known misstatement may result in a significant positive or negative market reaction.*" Plaintiffs have not alleged facts that would permit the inference that JPMC expected that the alleged misclassification of the loans might result in a significant market reaction.

*Id.* at 205 (internal citation omitted) (emphasis added). Thus, under *ECA*, in order for the market's reaction to a corrective disclosure to count as a qualitative factor in a plaintiff's favor,

---

[10] There can be no serious argument that *ECA* does not apply here, where CBRE's mezzanine loans and other investment assets were reported on the consolidated balance sheet that was part of the interim financial statements at the heart of the Complaint, and given plaintiffs' consistent reliance on GAAP, including in the proposed Third Amended Complaint, as a basis for CBRE's alleged duty to disclose. Plaintiffs seem to recognize the applicability of *ECA*, as they pay lip service to the quantitative/qualitative analysis employed therein (without citing the case), and they rely on *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000), in which the Second Circuit similarly relied upon SAB No. 99. Pl. Mem. at 7. Defendants previously cited both *ECA* and the district court decision it affirms.

the plaintiff must allege facts plausibly showing both a "significant market reaction" *and* that management knew of the misstatement and expected it to cause the market reaction.[11]

### 1. Plaintiffs Here Failed to Plead Quantitative Materiality

In view of the failure to allege facts showing a collateral value shortfall, the only inference supported by the Complaint was that the impaired amount of the Triton Loans or the amount thereof unduly at risk at the time of the IPO was *zero*.[12] Moreover, even if the Court were to assume an impaired or "at-risk" amount of the full $7.8 million impairment taken by CBRE during the class period defined by plaintiffs (September 29, 2006 through August 6, 2007, Corr. Compl. ¶ 1), this amount would be less than 0.55% of CBRE's total assets at the IPO effective date. In short, whether the magnitude of the alleged omission is viewed as zero (as it should be), or between zero and $7.8 million, quantitative materiality was not alleged in the Complaint.

In their memorandum, plaintiffs strain to inflate the financial magnitude of the alleged omission by comparing the total amount of the Triton Loans to "equity or capital" and "total loans and other lending investments." Pl. Mem. at 7. These metrics are irrelevant. First, it is plainly incorrect to use as the numerator in any percentage calculation *the entire amount of the*

---

[11] As SAB No. 99 explains, management's intent "may provide significant evidence of materiality" because an intentional misstatement or omission suggests that management believed that investors would consider the "truth" to be significant to users of the registrant's financial statements. 64 Fed. Reg. at 45152. Here, the Complaint expressly asserted that CBRE was negligent (although plaintiffs never explained what duty of care CBRE supposedly breached or how), not that it intended to overstate loan assets.

[12] In addition, had plaintiffs alleged a collateral value shortfall, they would have been required to plead facts showing the magnitude of the shortfall, as cases cited by the Court at page 18 of its Decision show, in order to plead quantitative materiality. *See Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007); *Gavish v. Revlon*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004). Absent some quantification of the impact of the alleged misstatement or omission, a complaint cannot, on the element of materiality, rise "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

*Triton Loans*, as there are no alleged facts from which it could possibly (much less plausibly) be inferred that the entire $51 million was impaired or unduly at risk at the time of the IPO. Second, the proper analysis is to compare the Triton Loans, which were a portion of the assets on CBRE's balance sheet, to its pool of total assets. *See ECA*, 553 F.3d at 204 (measuring the magnitude of alleged misstatement as percentage of total assets); *Ganino*, 228 F.3d at 164 (indicating that alleged misrepresentation amounting to 2% of total assets could be immaterial as a matter of law); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546-47 (8th Cir. 1997) (comparing alleged overstatement of assets to "total assets"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (same); *In re Fuwei Films Sec. Litig.*, 2009 WL 2005291, at *18 (S.D.N.Y. July 10, 2009) (materiality lacking where amount in issue was 2% of defendant's assets).

**2. Plaintiffs Here Failed to Plead Qualitative Materiality**

As noted above, there are several qualitative factors enumerated in SAB No. 99 that may show that a small misstatement is nevertheless material. 64 Fed. Reg. at 45150-52. Plaintiffs' motion focuses on one qualitative factor – the market's alleged reaction to CBRE's February and August 2007 Triton-related disclosures. Putting aside the dubious proposition that it could have been sufficient for plaintiffs to allege only one qualitative factor, even the "market reaction" factor does not belong in plaintiffs' column. Among other reasons, this is not a case where the Complaint plausibly showed that "management expect[ed] that a known misstatement may result in a significant positive or negative market reaction." *ECA*, 553 F.3d at 205 (internal quotation omitted). Indeed, *no such expectation could possibly have been pled* given that, as this Court has already held, the Complaint fails to allege knowledge by CBRE management of the supposed problems that allegedly required Triton-specific disclosures by CBRE at the time of its IPO. Decision at 13.

In short, the Complaint fails to allege that despite the relatively small size of the Triton Loans, reporting them as impaired or unduly at risk "would have made a qualitative difference." *ECA*, 553 F.3d at 205.

### 3. Pre-*ECA* Case Law Also Demonstrates That Plaintiffs' New Argument Lacks Merit

Pre-*ECA* case law further demonstrates that plaintiffs' reliance on stock price declines is insufficient to plausibly show materiality. *See, e.g.*, *Parnes*, 122 F.3d at 546-47 (overstatement of assets by less than 2% was immaterial despite 50% drop in stock price); *Westinghouse*, 90 F.3d at 715 (1.2% overstatement of total assets not material despite alleged 60% drop in stock price); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) ("Likewise, we cannot infer that the statements were false or misleading from the movement of the stock price alone, as Silver suggests, given the abundance of market variables."); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) ("Moreover, bare allegations of stock price declines cannot cure the immateriality of an overstatement as small as the one here at issue."); *In re Allied Capital Corp. Sec. Litig.*, 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003) (plaintiffs "would be hard-pressed to establish materiality based on the stock price's movement alone, since any number of factors unrelated to the alleged overstatements could have contributed to the decline in price").

This case plainly demonstrates why, even prior to *ECA*, courts refused to infer materiality based on a stock price decline alone. As discussed at pages 3-8 above, plaintiffs' assertion that the February and August 2007 price declines were in response to Triton-related disclosures is little more than dubious speculation, which in no way changes the fundamental implausibility of the proposition that a potential default on the fully secured Triton Loans would have been

viewed as significant by a reasonable investor. *See Levine*, 926 F.2d at 203 (discussed at note 9, *supra*).

Finally, as the Second Circuit has long recognized, the "presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled." *Halperin v. ebanker USA.Com, Inc*., 295 F.3d 352, 359 (2d Cir. 2002). Here, the IPO prospectus expressly and thoroughly warned investors of numerous risks associated with CBRE's real estate-related investments, including the risks of borrower defaults and falling real property prices that materialized here. Ex. N at 28-32 (IPO prospectus). Additionally, the prospectus also explained the "higher degree of risk" associated with CBRE's mezzanine loans. *Id.* at 35. Finally, the prospectus expressly advised investors that determining whether a loan is impaired is not an exact science, but rather that "[s]ignificant judgment is required both in determining impairment and in estimating the resulting loss allowance." *Id.* at 70.[13]

* * *

In short, no reasonable investor would have been misled as to the nature of the risks associated with an investment in CBRE, or would have viewed any additional disclosures regarding the potential risk of a Triton default (which necessarily would have included information as to CBRE's fully secured position) to have significantly altered the "total mix" of

---

[13] Plaintiffs argue that the Court erred by considering matters outside the pleadings. In support of this argument, they rely on a quotation attributed to CBRE's counsel, Robert S. Fischler, to the effect that the Court looked "behind the allegations." Pl. Mem. at 10. However, as explained in Mr. Fischler's accompanying declaration, he recalls that, in response to a question posed to him by a reporter, he said that the Court looked "behind the *conclusory* allegations" of the Complaint. Fischler Decl. ¶ 2.

available information. This Court reached the correct result, and should adhere to its initial decision.[14]

## II. THE COURT SHOULD DENY LEAVE TO FILE A THIRD AMENDED COMPLAINT

In the proposed Third Amended Complaint ("PTAC"), plaintiffs have added "materiality" allegations that essentially mimic the assertions in plaintiffs' memorandum of law. In addition, plaintiffs have added a description of certain allegations made in the Maryland Action. These allegations purport to show that CBRE was aware that Triton was unable to pay interest due on the Triton Loans absent the establishment of an interest reserve. For the reasons discussed below, the Court should deny leave to file the PTAC.

### A. The Standard of Review

"A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Notably, as here, when a moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." *Bellikoff*, 481 F.3d at 118 (internal quotation and alteration omitted). "[W]hile Rule 15 plainly embodies a liberal amendment policy, in the post-judgment setting we must also take into consideration the

---

[14] If the Court were inclined to reconsider any aspect of its Decision, we respectfully submit it would be appropriate to revisit the holding that "strict" liability is the standard in a Section 11 case involving an alleged omission. The Court recognized that it would be "sensible" to apply a "knew or should have known" standard in the omission context, yet apparently felt that *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983), precludes that approach. Decision at 14-15. However, the Court appears not to have considered two decisions that reconciled *Herman & Maclean* with a "knew or should have known" standard: (1) *In re The Ultimate Corp. Sec. Litig.*, 1989 WL 86961, at *1 (S.D.N.Y. July 31, 1989) (not previously cited by defendants herein), where the court addressed *Herman & Maclean* and concluded that it does *not* require a strict liability standard in the omission context; and (2) *In re Keegan Mgt. Co. Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992) (previously cited by defendants herein), which reached the same conclusion regarding the standard for pleading an omission claim under Section 11.

competing interest of protecting the finality of judgments and the expeditious termination of litigation." *Id.* (internal quotation omitted).

**B. Plaintiffs Unduly Delayed Seeking Leave to Amend**

Plaintiffs have been on notice since defendants moved, in July 2008, to dismiss the Corrected Complaint, that a key issue in this case was whether alleged facts plausibly showed a collateral value shortfall. The Court made it clear at oral argument of that motion on November 14, 2008 that it viewed the issue as one that was potentially dispositive. At the conclusion of argument, the Court gave plaintiffs an opportunity to amend the Corrected Complaint – to file their "best shot" – in order to address the concerns voiced by the Court. *See* pages 9-10, *supra.*

Plaintiffs responded with the Complaint, which they filed in December 2008. That pleading *did not add a single fact allegation regarding the value of CBRE's collateral at the time of the IPO*. At oral argument of defendants' motion to dismiss the Complaint, held on April 17, 2009, the Court signaled its continuing concern about the absence of "collateral value" allegations. Yet plaintiffs did not at that time seek leave to amend the Complaint, choosing instead to rest on their allegations. *See* pages 10-11, *supra*.

In short, plaintiffs were on notice when they filed the Complaint in December 2008 that the Court expected their "best shot," and that the Court had serious concerns about the Corrected Complaint's absence of allegations regarding a collateral value shortfall. The Court's concerns were again made clear at oral argument in April 2009. Yet, plaintiffs waited until after the Court issued its Decision on July 29, 2009 and judgment was entered to seek leave to add allegations related to the collateral shortfall issue. Plaintiffs offer no excuse for their delay, and they do not and cannot claim that any of the "facts" on which they now rely were unknown to them earlier.

Plaintiffs were even more cavalier regarding the allegations in the Maryland Action that plaintiffs now seek to add to this case. In May 2009, when plaintiffs asserted in a letter to the

Court that allegations in the Maryland Action weighed against dismissal of the Complaint, they chose not to move to amend the Complaint. Nor did they seek leave to amend when defendants expressly argued in response to plaintiffs' letter that this Court could not properly consider allegations in the Maryland Action because those allegations were not included in the Complaint herein. *See* pages 11-12, *supra*.

In view of the foregoing, the Court should exercise its discretion "exactingly" and deny leave to file the PTAC. *Bellikoff*, 481 F.3d at 118. If the concepts of "protecting the finality of judgments and the expeditious termination of litigation," *id.*, mean anything, they mean that it is too late for the plaintiffs here. It has been approximately two years since this litigation was commenced, and substantial legal fees and management time – not to mention a substantial investment of time and resources by this Court – has already been expended. *See State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) ("[A] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (internal quotation omitted). Having inexcusably waited until after the Court's decision to seek leave to amend, plaintiffs are in no position to invoke the permissive amendment standard set forth in Rule 15.

### C. The Proposed Amendment Is Futile

#### 1. The New "Materiality" Allegations are Insufficient

The requested amendment also fails on futility grounds. The "additional allegations" on materiality purportedly set forth in paragraphs 126-37 of the PTAC essentially reprise the arguments in plaintiffs' memorandum of law, and are insufficient for the reasons discussed

above. In addition, the allegations are largely conclusory, and therefore need not be taken as true for purposes of this motion.[15]

### 2. The New Allegations Regarding the Maryland Action are Insufficient

The new averments in paragraphs 138-41 of the PTAC are not allegations in their own right. Instead, these paragraphs do nothing more than describe allegations in the Maryland Action. (As discussed in Exhibit M, the counterclaim to which the allegations pertained was dismissed by the court in Maryland on motion by CBRE.) The allegations are not incorporated by reference in the PTAC, and thus add no alleged facts.

Even if the allegations in the Maryland Action were incorporated by reference, the PTAC would not state a claim. For one thing, the allegations are irrelevant on the issue of materiality. As plaintiffs describe the allegations, they "show that [d]efendants were aware of problems with the Triton loans prior to CBRE's IPO." PTAC ¶ 139. In reality, even assuming the allegations to be true, they would merely support the unremarkable conclusion that CBRE and Triton established what is commonly referred to as an "interest reserve," so that Triton could make interest payments to CBRE during the construction phase of the Monterey and Rodgers Forge projects, before they generated income sufficient to cover debt service. *See* Ex. M.[16]

---

[15] For example, plaintiffs' allegations that the Triton Loans were "quantitatively and qualitatively material;" that the Triton Loans were "especially important" to CBRE; that the "problems with the Triton Loans and underlying buildings would have significantly altered the total mix of information made available about CBRE at the time of its IPO;" and that the "Maryland real estate market was experiencing significant problems," are conclusory and thus entitled to no weight. PTAC ¶¶ 126, 127, 136.

[16] Plaintiffs suggest in the PTAC that CBRE *intended* to deceive its IPO investors regarding CBRE's financial position. *See, e.g.*, PTAC ¶ 140(ii). Thus, the allegations in the PTAC sound in fraud, not negligence. Accordingly, should the Court grant leave to plaintiffs to file the PTAC, defendants reserve their right to argue, in seeking dismissal of the new pleading, that it should be subject to a Rule 9(b) pleading standard. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

### 3. <u>The PTAC Contains Allegations Lacking a Good Faith Basis</u>

Finally, leave to file the PTAC should be denied on bad faith grounds. Throughout this case, plaintiffs have made allegations that lacked a good faith basis. They continue this pattern in the PTAC. For example, plaintiffs reprise in the PTAC allegations that contractors hired by Triton had ceased work, due to non-payment by Triton, on the Monterey and other Triton projects by the time of the IPO in September 2006. *See* PTAC ¶¶ 70-76. Yet these allegations are directly refuted by unequivocal documentary evidence in plaintiffs' possession – the so-called "LQA reports" prepared by the firm hired by the senior lender on the Monterey project to monitor construction progress at that project. *See* Ex. O at 3-5 (Mem. of Law, 1/15/09); Ex. P at 3-4 (Mem. of Law, 2/13/09). Although the Court previously indicated it would not consider the LQA reports in deciding defendants' motion to dismiss, that in no way gives plaintiffs license to ignore this evidence in framing allegations for a complaint.

**CONCLUSION**

For all the foregoing reasons and those discussed in defendants' prior memoranda of law, CBRE and the individual defendants respectfully request that the Court deny both reconsideration and leave to file a Third Amended Complaint.

Dated: September 15, 2009

PEPE & HAZARD LLP
Daniel J. Klau
Federal Bar No.: ct17957
dklau@pepehazard.com
Tel: (860) 522-5175
Fax: (860) 522-2796
225 Asylum Street
Hartford, CT 06103

ROPES & GRAY LLP

By: /s/ Robert S. Fischler
Robert S. Fischler
Federal Bar No.: ct18867
robert.fischler@ropesgray.com
Tel: (212) 841-0444
Fax: (646) 728-1625
1211 Avenue of the Americas
New York, NY 10036-8704

Justin J. Wolosz
Federal Bar No.: phv02361
justin.wolosz@ropesgray.com
Tel: (617) 951-7825
Fax: (617) 235-0580
One International Place
Boston, MA 02110-2624

*Attorneys for Defendants*