UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHILIP HUTCHISON, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:07-01599-SRU |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR |
| CBRE REALTY FINANCE, INC., RAY WIRTA, KEITH GOLLENBERG and MICHAEL ANGERTHAL, | ) ) ) ) | RECONSIDERATION OF THE COURT'S ORDER, DATED JULY 29, 2009 |
| Defendants. | ) ) ) ) | October 9, 2009 |

**TABLE OF CONTENTS**

**Page**

ARGUMENT..................................................................................................................1

I.      THE COURT SHOULD RECONSIDER THE OPINION...................................................1

II.     DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE
        MATERIAL ........................................................................................................2

        A.      The Market's Reaction Establishes Materiality........................................2

        B.      The Triton Loans Were Quantitatively and Qualitatively Material........................4

                1.      The Quantitative Factor Supports Materiality ............................................4

                2.      The Qualitative Factors Support Materiality ............................................7

III.    DEFENDANTS' OTHER ARGUMENTS ARE WITHOUT MERIT .............................8

IV.     THE COURT SHOULD GRANT LEAVE TO AMEND.................................................10

V.      CONCLUSION .................................................................................................10

# TABLE OF AUTHORITIES

**Page**

## CASES

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v.
JP Morgan Chase & Co.,*
553 F.3d 187 (2d Cir. 2009) ..............................................................................4, 5, 6

*Ganino v. Citizens Utilities Company,*
228 F.3d 154 (2d Cir. 2000) ...............................................................................4, 5, 7

*LC Capital Partners, L.P. v. Frontier Ins. Group,*
318 F.3d 148 (2d Cir. 2003) .......................................................................................9

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,*
No. 08-3398-cv, 2009 U.S. App. LEXIS 20652
(2d Cir. Sept. 17, 2009) .......................................................................................6, 10

*Polsby v. St. Martin's Press, Inc.,*
No. 97 Civ. 690 (MBM), 2000 WL 98057
(S.D.N.Y. Jan. 18, 2000) ......................................................................................8, 9

*Shrader v. CSX Transp., Inc.,*
70 F.3d 255 (2d Cir. 1995), *aff'd* No. 94-CV-34S, 1994 WL 721364
(W.D.N.Y. Dec. 7, 1994) ...........................................................................................1

*VIP of Berlin, LLC v. Town of Berlin,*
No. 3:06cv1811 (SRU), 2009 U.S. Dist. LEXIS 58466
(D. Conn. July 8, 2009) .............................................................................................1

## STATUTES, RULES AND REGULATIONS

SEC Staff Accounting Bulletin No. 99,
64 Fed. Reg. 45150 (1999) .........................................................................................7

Plaintiffs respectfully submit this reply memorandum in support of their Motion for Reconsideration of this Court's Order, dated July 29, 2009 (the "Motion" and "Order," respectively), granting the Motion to Dismiss the Second Amended Class Action Complaint ("Complaint")[1] by Defendants CBRE Realty Finance, Inc. ("CBRE" or the "Company"), Ray Wirta, Keith Gollenberg and Michael Angerthal (collectively, "Defendants").

## ARGUMENT

## I.    THE COURT SHOULD RECONSIDER THE OPINION

Defendants ignore the general purpose for motions to reconsider by asking this Court to deny Plaintiffs' Motion, ignore Plaintiffs' compelling and well-founded legal theories of materiality, and reject Plaintiffs' basic and fundamental request to replead their claims.  *See* Def. Opp. at 12-24.[2] The Motion should be granted and the Court should reconsider its holding in order to "correct a clear error or prevent manifest injustice." *VIP of Berlin, LLC v. Town of Berlin*, No. 3:06cv1811 (SRU), 2009 U.S. Dist. LEXIS 58466, at *13 (D. Conn. July 8, 2009).  Courts may reconsider a judgment when "the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995), *aff'd Shrader v. CSX Transp., Inc.*, No. 94-CV-34S, 1994 WL 721364 (W.D.N.Y. Dec. 7, 1994) (reconsidering and reversing an adverse decision because the defendant had pointed out legislative history and persuasive law not considered by the district court).

Here, the Court overlooked the important fact that CBRE's stock declined at the end of February 2007, even though Defendants told investors that the Triton Loans were fully secured. The Court also overlooked facts showing the quantitative and qualitative importance of the Triton Loans

---

[1]  "¶__" refers to paragraphs in the Complaint.
[2]  "Def. Opp." refers to the Memorandum of Law of Defendants in Opposition to Plaintiffs' Motion, filed September 15, 2009.  "Fischler Decl." refers to the accompanying declaration of Robert S. Fischler.

and omissions related thereto.[3]

## II.    DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL

### A.    The Market's Reaction Establishes Materiality

As set forth in the Motion, CBRE's stock price declined at the end of February 2007 and on August 7, 2007 due to Triton-related disclosures unrelated to revelations about the impairment of those loans. *See* Motion at 5-7. This demonstrates that investors considered the alleged omissions material. Defendants, however, attempt to minimize the impact of the Triton-related disclosures on CBRE's stock price. Defendants assert that the self-serving placement of the Triton-related disclosure in the Company's February 26, 2007 press release and excerpts from analyst reports that are outside of the Complaint suggest that "investors reacted to events unrelated to Triton." *See* Def. Opp. at 3-4.[4]

Contrary to Defendants' rendition of the facts, the problems with the Triton Loans revealed on February 26 and 27, 2007 were very serious and were communicated in multiple ways:

- On February 26, 2007, CBRE issued a press release announcing that *The Monterey* loan had been "classified as non-performing" and *The Rodgers Forge* loan had been added to CBRE's "watch list" due to "a specific borrower issue";

- On February 27, 2007, CBRE filed a Form 8-K with the SEC disclosing the same facts contained in the February 26, 2007 press release;

- On February 27, 2007, CBRE conducted an earnings conference call with analysts and investors, during which CBRE explained that: (i) the "non-performing" and "watch list" loans resulted from the fact that Triton "experienced liquidity problems"; (ii) as soon as Triton missed its first payment on *The Monterey* loan in January 2007, CBRE took "an immediate default and accelerations of the loan" and "began looking at all of [its] legal enforcement issues"; (iii) CBRE was funding Triton's payments to senior lenders in an effort to protect its own investment; and (iv) CBRE was "in the middle of that process" of "acquir[ing] the asset" that served as collateral on the loans;

- During that February 27, 2007 call, CBRE expressly stated that it was pursuing "foreclosure" with respect to the Triton Loans; and

---

[3]    All capitalized terms herein are as defined in Plaintiffs' Motion.

[4]    The Court should not consider the facts submitted by Defendants that are outside of the Complaint and they should be stricken.

- On February 26, 27 and 28, 2007, numerous analysts covering CBRE further reported to investors these "problems" with the "non-performing" and "watch list" loans made to Triton, that the loans were currently "in work-out," and that CBRE was addressing these problems by, among other things, "seeking to control the property" used as "collateral" – in other words, foreclosure.

See Reply Declaration of Evan J. Kaufman in Further Support of Plaintiffs' Motion ("Kaufman Reply Decl."), dated October 9, 2009 and submitted herewith, Exh. A, Underwriter Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss, filed October 31, 2008, at 6-7.[5]

Even the analyst reports submitted by Defendants support Plaintiffs' position that the Triton-related disclosures were material to investors. For example, the first page of the Oppenheimer report discusses the two Triton Loans and provides four reasons for the drop in CBRE's stock price, two of which are directly related to the allegations in the Complaint – credit issues and management credibility concerns. See Fischler Decl., Exh. C, at 1.[6]

Accepting all material facts alleged in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs – as the Court must – the Court should infer that CBRE's stock dropped on February 27 and 28, 2007 in response to the negative news about the Triton Loans; a drop that occurred even though Defendants told investors that the collateral was sufficient to cover those loans. Once again, drawing all reasonable inferences in favor of Plaintiffs, the Court should infer that investors deemed the misrepresentations and omissions about the Triton Loans material irrespective of their carrying value.[7] At a minimum, this creates an issue of fact that should not be

_____

[5]  The Underwriter defendants cited these facts to show that the February disclosures about the Triton Loans and related price drops were so significant that they triggered inquiry notice. Defendants never contested these facts when they were raised by the Underwriter defendants.

[6]  The Oppenheimer report stated that the problems with the Triton buildings "had a detrimental impact on valuation." The Credit Suisse report also supports materiality because it references the non-performing Triton Loan on the first page of the report. See Fischler Decl., Exh. B at 1. These reports would not have discussed the Triton-related disclosures if they were not important.

[7]  At the November 14, 2008 hearing, the Court indicated that a drop in CBRE's stock price after a disclosure

resolved in Defendants' favor at this time because it will be subject to expert opinion. Indeed, as admitted by Defendants' counsel at the November 18, 2008 hearing: "I think at the end of the day if the case goes forward, [the reason for CBRE's stock decline] will be an issue for the experts to fight about in one of their famous events studies while trying to isolate the cause of that."[8] Kaufman Reply Decl., Exh. B, 11/14/08 Tr. at 31:8-11.

### B.    The Triton Loans Were Quantitatively and Qualitatively Material

#### 1.    The Quantitative Factor Supports Materiality

Defendants rely principally on the quantitative threshold discussed in *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase & Co.*, 553 F.3d 187 (2d Cir. 2009) ("*ECA*") to argue that their misrepresentations could not have been material. *See* Def. Opp. at 14-17. The Court should reject that argument for a number of reasons. First, the Second Circuit in *ECA* followed its holding in *Ganino v. Citizens Utilities Company*, 228 F.3d 154 (2d Cir. 2000) and rejected a bright line rule based upon a percentage of assets. *ECA*, 553 F.3d at 204. Second, as discussed in the Motion, the Triton Loans were quantitatively material to CBRE. *See* Motion at 7-8. The value of the Triton Loans should be compared to "like items on the corporate financial statement." *Ganino*, 228 F.3d at 165 (holding that items in issue should be compared to like items and listing cases). Thus, when comparing the Triton Loans to the "like items on [CBRE's] financial statement," as of June 30, 2006, they comprised 8% of total loans and other lending investments and

---

is indicative of materiality. *See* Kaufman Reply Decl., Exh. B, November 14, 2008 Hearing Transcript ("11/14/08 Tr.") at 43:16-19 (stating: "[M]y feeling on the materiality is when it's disclosed August 6 and it drops 32 percent August 7, something in that announcement was material."). The Court then added: "But, for today's purposes, it seems to me materiality is maybe [Defendants'] weaker argument because, you know, an inference is going to arise from the drop in the stock price . . ." *Id.* at 43:25-44:3.

[8]   The lack of a CBRE stock drop on May 7, 2007 does not show anything other than the fact that the market may have had already digested much of the negative news about the Triton Loans prior to that date. Furthermore, contrary to Defendants' assertion, the August 6, 2007 press release did characterize *The Rodgers Forge* as "non-earning." Additionally, even though CBRE represented that *The Rodgers Forge* was not impaired, CBRE did disclose that it anticipated expending $2 million on this project, causing, in part, CBRE's stock decline. ¶¶122-23.

5.3% of total assets. PTAC ¶128; Kaufman Reply Decl., Exh. C, April 17, 2009 Hearing Transcript

("4/17/09 Tr.") at 23:8-16.[9] As of June 30, 2006, the Triton Loans comprised 18% of total equity or

capital, 8% of total loans and other lending investments, and 5.3% of total assets. PTAC ¶128;

Kaufman Reply Decl., Exh. C, 4/17/09 Tr. at 23:10-13. As of December 31, 2006, the Triton Loans

totaled approximately 25% of CBRE's mezzanine loans and 6% of loans and other lending

investments. ¶102.

Defendants attempt to minimize the quantitative importance of the Triton Loans by focusing

exclusively on the $7.8 million impairment charge recorded on *The Monterey* and comparing that

figure to CBRE's total assets. It is improper to do so for several reasons. First, Plaintiffs do not

allege that CBRE failed to timely record impairment on its financial statements.[10] Instead, Plaintiffs

allege that Defendants failed to disclose that the Triton Loans, which were a large portion of CBRE's

loans, were troubled at the time of the IPO. Therefore, the Court should focus on the total value of

the Triton Loans related to loans outstanding, their significance to CBRE and the potential total loss

in connection with those loans – not the value of the impairment.[11] Indeed, the Oppenheimer report

submitted by Defendants states that the Triton Loans made up 6% of CBRE's loan portfolio. *See*

Fischler Decl., Exh. C at 2. This shows that viewing the Triton Loans as a percentage of CBRE's

---

[9]    Defendants attempt to reduce the quantitative importance of the Triton Loans by comparing them to CBRE's assets during *2007*. *See, e.g.*, Def. Opp. at 8 n. 6 (comparing *The Rodgers Forge* loan to CBRE's total assets as of June 30, 2007). The proper date for materiality is the date of CBRE's IPO. *See Ganino*, 228 F.3d at 165.

[10]    *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint, filed February 5, 2009, at 4 n. 5 ("The allegations concerning Defendants' failure to take an impairment charge for the Triton Loans at the time of the IPO have been deleted, notwithstanding Defendants' arguments that these claims remain in the SAC"). Defendants use this fiction as their launching pad for their argument that the misrepresentations and omissions could only be material if the loans were impaired.

[11]    The Second Circuit in *ECA* compared the classification of the loans to total assets because the plaintiffs alleged that the defendants misclassified loans from one asset group to another, so the Second Circuit evaluated the materiality of the loans as it related to total assets. *See ECA*, 553 F.3d at 204. As in *ECA*, the total value of the Triton Loans, and not the accounting impact, should be compared to CBRE's total loans and assets.

loan portfolio was an important metric for investors.

Second, focusing solely on the impairment charge for *The Monterey* ignores all of the other risks or non-financial problems associated with *The Monterey* loan and *The Rodgers Forge* loan, including the $1.7 million CBRE expended to protect its position in *The Rodgers Forge* loan announced on March 26, 2007 and the additional $2 million announced on August 6, 2007. ¶¶115, 122.

Third, even if the Court does consider the impairment recorded in connection with *The Monterey* loan, it is not proper – as advocated by Defendants – to evaluate the value of the impairment as a percentage of CBRE's total assets because an impairment is recorded as a charge to earnings on the income statement. The appropriate comparison, therefore, is to evaluate the quantitative impact that the impairment had on the Company's income statement, which was substantial. In fact, as reported by CBRE on August 6, 2007, as a direct result of the $7.8 million impairment of *The Monterey*, CBRE's net-income for the second quarter 2007 changed from a positive $3.2 million to a net loss of $4.6 million. *See* Fischler Decl., Exh. I at 6-7. In other words, the impairment charge for *The Monterey* was more than double the total earnings of the entire Company for that quarter and substantially more than the 5% threshold referenced in *ECA*.[12]

Importantly, if the Court considers the value of the impairment charge, it should be compared to the Company's earnings as of June 30, 2006, the most recent financial quarter at the time of the IPO, not the quarter ended June 30, 2007. *See Ganino*, 228 F.3d at 165. This increases the quantitative value of the impairment. For the quarter ended June 30, 2006, CBRE's net income was $2,251,000, so the impairment charge represented almost 3.5 times the Company's total earnings and

---

[12]  Defendants incorrectly assert that had Plaintiffs alleged a collateral value shortfall, they would have been required to plead facts showing the magnitude of the shortfall. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 08-3398-cv, 2009 U.S. App. LEXIS 20652 (2d Cir. Sept. 17, 2009) (summary order) (applying notice pleading to §11 claim and rejecting the same approach to pleading advocated by Defendants here.)

would have resulted in a net loss of $5,549,000 for that quarter.  *See* Kaufman Reply Decl., Exh. D, CBRE's Form S-11/A, filed with the SEC on September 26, 2009, at 56.

### 2.    The Qualitative Factors Support Materiality

Even though materiality is shown through the quantitative factor, the Court should also consider qualitative factors that support a finding of materiality.  *See, e.g., Ganino*, 228 F.3d at 162, 166 (finding materiality even though fees amounted to only 1.7% of Citizens' 1996 total revenue). SEC Staff Accounting Bulletin ("SAB") No. 99 sets out qualitative factors, including, *inter alia*: (i) the significance of the misstatement in relation to the company's operations; (ii) whether the misstatement masks a change in earnings or other trends; and (iii) whether the misstatement changes a loss into income or vice versa.  *See* SAB No. 99, 64 Fed. Reg. 45150, 45152 (1999).

First, the Triton Loans were significant in relation to the Company's operations.  *See* Motion at 7-8.  Real estate financing was central to CBRE's business and mezzanine loans, and the Triton Loans in particular, were especially important.  At June 30, 2006, mezzanine loans totaled 60% of CBRE's total capital, 27% of CBRE's loans and 20% of its entire investment portfolio. PTAC ¶127. At June 30, 2006, CBRE only had eight mezzanine loans – two of which were the Triton Loans, which comprised 25% of total Mezzanine loans.  *Id.*; ¶102.  Second, the misstatements masked a change in earnings or other trends.  Triton's financial distress and the financial problems with the Triton buildings masked a change in earnings and negative trend in the real estate market in Maryland for the Company.  Third, if the Court looks to the impairment charge as advocated by Defendants, another qualitative factor is met as well: the misstatements changed a loss into income or vice versa.  As discussed above, the impairment charge changed a multi-million dollar profit into a multi-million dollar loss both at the time of the IPO and at the time the impairment was recorded.

The Motion described numerous other qualitative factors, including cash flow problems and issues with the monetization of the collateral.[13]  *See* Motion at 8-10.

## III.    DEFENDANTS' OTHER ARGUMENTS ARE WITHOUT MERIT

Defendants cite *Polsby v. St. Martin's Press, Inc.*, No. 97 Civ. 690 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) for the proposition that a party may not "advance new facts, issues or arguments not previously presented to the Court" and assert that Plaintiffs should be prohibited from raising the arguments contained in the Motion.  Contrary to Defendants' rendition of the procedural history and facts of this litigation, Plaintiffs are not advancing new facts, issues or arguments.

Plaintiffs have repeatedly refuted Defendants' position that materiality is dependent upon the value of the collateral.  *See* Kaufman Reply Decl., Exh. C, 4/17/09 Tr. at 25:8-22.  Plaintiffs alleged in the Complaint that after the February 26, 2007 disclosures, CBRE's stock dropped 18% during the two day period ended February 28, 2007, even though CBRE announced that "it had no impairment or loss reserves [on the Triton Loans] since inception."  ¶114.  In fact, the Court acknowledged these facts in the Order at 5.  Plaintiffs also allege that the drop in CBRE's stock price in August 2007 was related to the revelation of additional problems with the Triton Loans, including incurring an additional $2 million expenditure.  ¶¶122-23.

*Polsby* is inapposite.  In *Polsby*, the plaintiff submitted a motion that contained "numerous new factual allegations, including a description of her litigation history and her attempts to obtain counsel . . . and the hearsay views of counsel who are said to believe that plaintiff's claims have merit."  *Id.* at *1.  Here, Plaintiffs make the same argument previously advanced to the Court – that the value of collateral is not dispositive on materiality.  Indeed, the court in *Polsby* reasoned that the

---

[13]    As a REIT, CBRE must distribute 90% of REIT taxable income to stockholders and the Registration Statement for the IPO specified that a risk to investors was CBRE failing to "achieve adequate operating cash flow" that would negatively impact the Company's ability to distribute dividends. *See* Kaufman Reply Decl., Exh. D, CBRE Form S-11/A at 27. Even if the collateral for the Triton Loans was more than the carrying value, there was a risk that dividend payments may have been negatively impacted if payments on the Triton Loans were interrupted – a risk that would have been material to investors.

court could not have "overlooked" facts that were not yet presented to the court at the time of the original opposition. Here, the facts relied upon by Plaintiffs were contained in the Complaint.

Next, and unsupported by case law, Defendants assert that the Court should refuse to consider the Motion because Plaintiffs' position is inconsistent with an earlier position taken by Plaintiffs in response to the statute of limitations argument made by the Underwriter defendants. Contrary to Defendants' characterization, Plaintiffs never asserted that the Triton-related disclosures in the February 26, 2007 press release were not material to investors because there was no impairment of the Triton Loans. Plaintiffs consistently alleged and asserted that CBRE's stock drop in February 2007 was related to the disclosures about the Triton Loans. Plaintiffs simply argued that the disclosures in February 2007 alone did not place investors on inquiry notice and that CBRE's statements of comfort about the loans being fully collateralized negated an inference that inquiry notice was triggered.[14] *See* Kaufman Reply Decl., Exh. B, 11/14/08 Tr. at 48:7-54:3. There is nothing inconsistent about Plaintiffs' position. There is a clear distinction between a stock drop as a result of a disclosure for purposes of materiality and a stock drop for purposes of inquiry notice. A stock can drop as a result of a disclosure – as occurred here – without inquiry notice being triggered.[15]

Defendants' argument that Plaintiffs have made allegations that lack a good faith basis is without merit and should be rejected. *See* Def. Opp. at 24. Defendants are presenting inappropriate

---

[14] When warning signs are offset by "reliable words of comfort from management" on which investors "would reasonably rely," dismissal is inappropriate because a disputed issue remains for trial. *LC Capital Partners, L.P. v. Frontier Ins. Group*, 318 F.3d 148, 155-56 (2d Cir. 2003).

[15] *See* Kaufman Reply Decl., Exh. B, 11/14/08 Tr. at 40:9-44 (Plaintiffs telling the Court that at the time of the late February 2007 disclosures, CBRE represented that the collateral on the Triton Loans was in excess of book value and that the loans were not impaired). The Court, by its line of questioning, indicated that the February 2007 disclosures may have been enough to trigger inquiry notice about problems with the Triton Loans. *See id.* If the drop was so severe and related to the disclosures about the Triton Loans to trigger a duty to investigate a potential cause of action relating to the Triton Loans, how can it be found – as a matter of law at this stage – that the February 2007 disclosures about the Triton Loans did not cause the drop in CBRE's stock price or that they were not material?

factual evidence through unauthenticated documents to refute allegations based upon a confidential witness. First, there is no evidence of what these documents actually are or whether they are in fact real. Second, even if the documents are real, without discovery, there is no way to determine the significance of the documents. Third, only through discovery will it be determined how many other documents exist, including any that contradict the facts contained therein and fully support Plaintiffs' claims and the account of the witness. In the event that the Court is inclined to review the good faith basis of any representation made to the Court, Plaintiffs respectfully submit that the Court review Defendants' persistent mischaracterization of the core of Plaintiffs' claims as being about CBRE's failure to record an impairment on the Triton Loans.

## IV.    THE COURT SHOULD GRANT LEAVE TO AMEND

Defendants assert that Plaintiffs should not be granted leave to amend because too much time has passed. *See* Def. Opp. at 21. Defendants' argument should be rejected under the recent *Panther Partners* opinion, where the Second Circuit held that leave to amend should be granted if it is possible that a plaintiff can cure defects in the complaint with an amendment. *See Panther Partners*, 2009 U.S. App. LEXIS 20652, at *11 (summary order). As set forth in Plaintiffs' October 1, 2009 letter to the Court discussing this opinion, the Second Circuit takes a liberal and lenient approach to amendments.[16] Since the PTAC contains numerous factual allegations that provide additional support for materiality (in addition to allegations showing that Defendants knew of the problems with the Triton Loans), Plaintiffs should be granted leave to amend. *Id.* at *11.

## V.    CONCLUSION

For the foregoing reasons and the reasons set forth in the Motion, Plaintiffs respectfully request that the Court grant the Motion.

---

[16]    Each of the arguments made in the October 1, 2009 letter are hereby incorporated by reference, including Plaintiffs' argument on strict liability, the pleading standard and leave to amend. Defendants ask the Court to reconsider it holding on a strict liability standard under Section 11. Defendant' request is an inappropriate motion for reconsideration, does not address the issues raised in Plaintiffs' Motion, and should be denied.

DATED: October 9, 2009

Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (ct18015)
DAVID A. ROSENFELD (ct25818)
EVAN J. KAUFMAN (phv03034)

                */s/ Evan J. Kaufman*
                EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

IZARD NOBEL LLP
JEFFREY S. NOBEL (ct 04855)
NANCY A. KULESA (ct 25384)
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: 860/493-6292
860/493-6290 (fax)

*Liaison Counsel*

ALLOTTA, FARLEY & WIDMAN CO., L.P.A.
MARILYN L. WIDMAN
JOSEPH J. ALLOTTA
MICHAEL E. HEFFERNAN
2222 Centennial Road
Toledo, OH 43617
Telephone: 419/535-0075
419/535-1935 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2009, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Evan J. Kaufman
Evan J. Kaufman (phv03034)
Coughlin Stoia Geller Rudman
 & Robbins LLP
58 South Service Roud, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
Facsimile: 631/367-1173
E-mail: ekaufman@csgrr.com