UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHILIP HUTCHISON, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:07-01599-SRU |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | NOTICE OF APPEAL |
| | ) | |
| vs. | ) | |
| | ) | |
| CBRE REALTY FINANCE, INC., RAY WIRTA, KEITH GOLLENBERG and MICHAEL ANGERTHAL, | ) ) ) ) | |
| | ) | April 23, 2010 |
| Defendants. | ) ) | |
| | ) | |

PLEASE TAKE NOTICE that Lead Plaintiffs Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund and Alfred Ivers and Plaintiff West Palm Beach Firefighters Pension Fund (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, appeal to the United States Court of Appeals for the Second Circuit from the District Court's judgment of dismissal (Dkt. #104), including the following two Orders:

1.      The July 29, 2009 Order granting Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Dkt. #103); and

2.      The March 25, 2010 Ruling denying Plaintiffs' Motion for Reconsideration (Dkt. #123).

DATED:  April 23, 2010                        ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                              SAMUEL H. RUDMAN (admitted pro hac vice)
                                              DAVID A. ROSENFELD (admitted pro hac vice)
                                              EVAN J. KAUFMAN (admitted pro hac vice)


                                              EVAN J. KAUFMAN

                                              58 South Service Road, Suite 200
                                              Melville, NY 11747
                                              Telephone:  631/367-7100
                                              631/367-1173 (fax)

                                              Lead Counsel for Plaintiffs

                                              IZARD NOBEL LLP
                                              JEFFREY S. NOBEL (ct 04855)
                                              NANCY A. KULESA (ct 25384)
                                              29 South Main Street, Suite 215
                                              West Hartford, CT  06107
                                              Telephone:  860/493-6292
                                              860/493-6290 (fax)

                                              Liaison Counsel

ALLOTTA, FARLEY & WIDMAN CO., L.P.A.
MARILYN L. WIDMAN
JOSEPH J. ALLOTTA
MICHAEL E. HEFFERNAN
2222 Centennial Road
Toledo, OH  43617
Telephone:  419/535-0075
419-535-1935 (fax)

Additional Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2010, a copy of the foregoing was filed and served by mail on the parties listed below. Notice of this filing system will also be sent by e-mail to all parties by operation of the Courts electronic filing system. Parties may access this filing through the Court's CM/ECF System.

**Daniel J. Klau**
Pepe & Hazard
225 Asylum Street
Hartford, CT 06103-4302

**Harvey J. Wolkoff**
**Justin J. Wolosz**
Ropes & Gray LLP- MA
One International Place
Boston, MA 02110-2624

**Robert S. Fischler**
Ropes & Gray LLP-NY
1211 Avenue of the Americas
New York, NY 10036-8704

Nancy A. Kulesa

# Exhibit 1

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

PHILIP HUTCHISON, Individually and On
Behalf of All Others Similarly Situated,
SHEET METAL WORKERS, LOCAL NO. 33,
ALFRED IVERS, and WEST PALM BEACH
FIREFIGHTERS PENSION FUND,
      Plaintiffs,

v.                                3:07CV1599 (SRU)

CBRE REALTY FINANCE, INC., KEITH
GOLLENBERG, MICHAEL ANGERTHAL,
and RAY WIRTA,
      Defendants.

On October 30, 2007, Philip Hutchison filed a class action complaint[1] on behalf of "all

persons . . . who purchased the common stock of CBRE [Realty Finance, Inc.] pursuant and/or

traceable to the Company's initial public offering (the "IPO") on or about September 29, 2006

(the 'Class'/'Plaintiffs')." Compl. at ¶ 1.[2] The named defendants include CBRE Realty Finance,

Inc. ("CBRE"), "a commercial real estate specialty finance company," and several individual

---

[1] The class has yet to be certified under the provisions of either Fed. R. Civ. P. 23, or section 27(a) of the Securities Act of 1933, *codified at* 15 U.S.C. §§ 77z-1(a)(1)-(8).

[2] Hutchison, on behalf of himself and all others similarly situated, filed the initial complaint in this case on October 30, 2007. On March 24, 2008, the plaintiffs filed the First Amended Complaint on March 24, 2008, naming Sheet Metal Workers Local No. 33 and Alfred Ivers (collectively, "Lead Plaintiffs") as the lead plaintiffs. A "Corrected Amended Class Action Complaint" was filed on May 6, 2008, to correct deficiencies in the case caption, and a "Second Amended Class Action Complaint" was filed on December 22, 2008, following oral argument on the defendants' initial motions to dismiss; that pleading is now the operative complaint in this action. The Second Amended Class Action Complaint also added the West Palm Beach Firefighters Pension Fund as a plaintiff. Throughout this opinion, unless otherwise indicated, I refer to the Second Amended Class Action Complaint as "the complaint," and I cite to the complaint as "Compl."

defendants who held executive and management positions at CBRE during the relevant time period at issue (the "Individual Defendants").[3]  *Id*. at ¶¶ 14–18.

The plaintiffs claim violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933,[4] based on allegations that CBRE failed to disclose (in both its IPO registration statement and sales prospectus) that one of its outstanding debtors, Triton Real Estate Partners, Inc. ("Triton"), was experiencing "severe financial distress" in connection with two real estate development projects to which CBRE had provided financing (the "Triton Loans").  *Id*. at ¶ 81. Specifically, the plaintiffs contend that CBRE's failure to disclose the risks associated with the Triton Loans contravened standards of Generally Accepted Accounting Principles ("GAAP"), resulting in a "negligently prepared" registration statement and prospectus that induced the plaintiffs to purchase CBRE shares at "materially inflated prices."  *Id*. at ¶¶ 6, 84–112.

In response, the defendants argue that the plaintiffs fail to "plead facts showing knowledge by [CBRE] of any [information] that required [CBRE] to [disclose] the [Triton] Loans prior to the [IPO] or to make any specific disclosures in the offering documents regarding the [Triton] [L]oans."  Mot. Dismiss 2.[5]  In the alternative, the defendants argue that plaintiffs

---

[3] Initially, the plaintiffs also sued various investment banks that had served as underwriters for CBRE's IPO.  Those defendants have since been voluntarily dismissed from further proceedings.  The remaining Individual Defendants include: (1) CBRE's former Chairman, Interim CEO, and President, Ray Wirta, (2) CBRE's former President, CEO, and Director, Keith Gollenberg, and (3) CBRE's former CFO, Executive Vice President, and Treasurer, Michael Angerthal.  Compl. ¶¶ 15–17.  Each of the Individual Defendants signed CBRE's Registration Statement.  *Id*.

[4] Those sections of the Securites Act of 1933 are codified at 15 U.S.C. §§ 77k, 77l(a)(2), and 77o respectively.

[5] Unless otherwise indicated, citations to "Mot. Dismiss" refer to the defendants' motion to dismiss the Second Amended Class Action Complaint.

2

Hutchison and Sheet Metal Workers, Local No. 33 ("SMW") lack standing because "they did not purchase their shares in the IPO or at any other time before unregistered shares entered the market." Mem. in Support of Mot. Dismiss at 13.

On November 14, 2008, I heard oral argument on motions to dismiss the Corrected Amended Class Action Complaint (which was then the operative pleading). At that time, I dismissed the section 12(a)(2) claim without prejudice; the plaintiffs have re-pled that claim. For the reasons that follow, the defendants' motion to dismiss is GRANTED.

## I.    Factual Background

I assume the following facts, as set forth in the Complaint, as true:

As a real estate financier, defendant CBRE focuses its business on "originating and acquiring whole loans, bridge loans, subordinate interests in whole loans, commercial mortgage-backed securities, mezzanine loans, and joint venture interests in entities that own commercial real estate." Compl. at ¶ 14. On September 26, 2006, CBRE filed with the Securities and Exchange Commission (the "SEC") a Form S-11/A Registration Statement in advance of its anticipated IPO. *Id.* at ¶ 40. The registration statement declared that CBRE intended to issue 9.6 million common shares to the public at $14.50 a share, with an underwriter purchase option of up to an additional 1.44 million common shares at the same price. *Id.* On September 27, 2006, the SEC declared the sales prospectus effective, and CBRE ultimately raised approximately $144 million through its IPO. *Id.* at ¶ 41.

At the time of the IPO, CBRE had made two mezzanine loans to real estate developer Triton Real Estate Partners, LLC ("Triton"), with an aggregate carrying value of approximately $51 million. *Id.* at ¶¶ 46–47. Those loans were to provide financing for two condominium

3

conversion projects in Maryland, The Rodgers Forge and The Monterey.[6] *Id.* In the fall of 2006,

"missed real estate tax payments, declining sales of Triton's converted condominium units," and

cost overruns in connection with the Monterey project caused the Triton Loans to "go bad." *Id.*

at ¶¶ 58–60. Additionally, in the summer of 2006, Triton "became delinquent in making

payments to contractors, and . . . Triton attempted to 'recapitalize'" by seeking a cash infusion

from foreign investors, which never materialized. *Id.* at ¶ 68. "As a result of this [severe]

financial distress that began *before* the IPO, renovation stalled, undeveloped apartments went

vacant, and partially converted condominiums went unsold . . . ." *Id.* at ¶ 70 (emphasis added).

Collectively, these problems "adversely affected Triton's cash flow and indicated that the risk of

default associated with [the Triton] [L]oans had increased significantly." *Id.*

When filed with the SEC, CBRE's registration statement contained an unaudited

financial report maintaining that the Company "did not identify any loans that exhibit

characteristics indicating that impairment had occurred."[7] *Id.* at ¶ 97. The plaintiffs allege,

however, that at the time of the IPO, the Triton Loans were exhibiting such characteristics. *Id.* at

¶¶ 83, 98. At or about the time of the IPO:

- Triton had breached loan covenants with the senior lenders on *The Monterey*;

---

[6] The Rodgers Forge loan had a carrying value of $19.7 million and the Monterey loan had a carrying value of $31.8 million. Compl. at ¶¶ 46–47. In each instance, the condominium property served as collateral for the loan. *Id.*

[7] The Registration Statement defined impairment as follows:
> Loans and other investments are considered to be impaired, for financial reporting purposes, when it is deemed probable that the Company will be unable to collect all amounts due according to the contractual terms of the original agreements, or, for loans purchased at a discount for credit quality, when the Company determines that is it probable that it will be unable to collect as anticipated.

*Id.* at ¶ 97.

4

- Triton was financially "over-extended" with multiple ongoing condo-conversion projects in a local market that was rapidly deteriorating;

- Triton had accumulated significant cost overruns on *The Monterey* and *The Rodgers Forge* properties;

- Triton was aggressively seeking funding from equity investors;

- Triton had defaulted on payments to subcontractors, causing them to halt construction, thereby stalling development on *The Monterey* and *The Rodgers Forge*; and

- Converted [condominium] units went unsold and partially converted apartments at *The Monterey* and *The Rodgers Forge* remained vacant.

*Id .* at ¶ 98.  Also, the registration statement failed to "include significant factors that made the IPO risky," including geographical business constraints and local regulatory impediments associated with the Triton Loans. *Id .* at ¶¶ 107–12.

At the close of trading on February 26, 2007, CBRE issued a press release "announcing its financial results for the fourth quarter [of 2006]" and indicating that on December 31, 2006, CBRE had classified the Monterey loan as non-performing.[8] *Id.* at ¶ 114.  CBRE also announced that the Rodgers Forge loan was on the company's "watch list," but that CBRE "had no impairment or loss reserve since inception." *Id.*  Following this revelation, "the price of CBRE common stock declined more than 18% on extremely heaving [trading] volume during the two day period ending February 28, 2007."[9] *Id.*

"On or about March 26, 2007, CBRE filed its December 31, 2006 Form 10-K with the

---

[8] Given the problems associated with the Monterey project, the senior lender on the Monterey loan, Freemont, placed the loan on its "watch list before CBRE's IPO" in September 2006. *Id.* at ¶ 65.

[9] By that time Triton had filed for bankruptcy protection. *Id.* at ¶ 83.

SEC," disclosing the non-performing and watch list loans, and stating that the Company had "funded approximately $1.7 million to protect [its] mezzanine loan position in [the Rodgers Forge] asset." *Id.* at ¶ 115. Less than two months later, CBRE foreclosed on both the Rodgers Forge and the Monterey properties, writing-down the value of both loans and incurring a $7.8 million impairment charge with regard to the write-down of the Monterey project.[10] *Id.* at ¶¶ 117, 120, 122.

At or around the time of the foreclosures, more than half of the Rodgers Forge units were vacant "and only about a dozen of the units converted into condominiums had been sold."[11] *Id.* at ¶ 117. Likewise, less than 1% of The Monterey's units had been renovated, with "only 35% of the building leased."[12] *Id.* at ¶ 120. After the markets closed on August 6, 2007, CBRE issued a press release about its financial position for the second quarter of 2007, including information regarding the foreclosed assets. *Id.* at ¶ 122. Following that announcement, CBRE's stock value declined from $6.25 a share to $4.25 a share, "a decline of 32% and 70% lower than the IPO price of $14.50." *Id.* at ¶ 123.

The plaintiffs in this action seek class certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, compensatory damages (with interest), costs and expenses (including attorneys', accountants', and experts' fees), and rescission or a rescissory measure of damages with respect to their section 12(a)(2) claim. *Id.* at p. 41. The defendants

---

[10] CBRE foreclosed on The Rodgers Forge on May 4, 2007, and five days later, on May 9, CBRE foreclosed on The Monterey. *Id.* at ¶¶ 117, 120.

[11] The Rodgers Forge was intended to be a 508-unit conversion project. *Id.* at ¶ 46.

[12] The Monterey was intended to be a 434-unit conversion project. *Id.* at ¶ 47. At the time of foreclosure "214, or almost 50% of [The Monterey's] total units, were in various stages of renovation" and "216 units were [completely] un-renovated." *Id.* at ¶ 120.

argue that the plaintiffs have failed to adequately "allege the material misstatement or omission that is an element of [their] Securities Act claims," and that the complaint should be dismissed in its entirely under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, the defendants have moved pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss claims brought by plaintiffs Hutchison and SMW for lack of standing.[13]

## II.   Discussion

### A.   Standard of Review for Failure to State a Claim Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. Spalding*, 467 U.S. 69, 73 (1984). The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Discount Bank*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. Westpoint-Pepperell, Inc*, 945 F.2d 40, 44 (2d Cir. 1991)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the

---

[13] Because, for the reasons discussed below, the defendants' motion to dismiss is granted for failure to state a claim under Rule 12(b)(6), I do not reach the question of standing under Rule 12(b)(1).

material facts alleged in the complaint as true, draw all reasonable inferences in favor of the

plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft*

*v. Iqbal,* 129 S.Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969

(2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). Finally, the relevant issue on a 12(b)(6)

motion "is not whether the plaintiff will prevail, but whether he is entitled to offer evidence to

support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp. 784, 786 (D. Conn.

1990) (citing *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)).

Under *Twombly,* "factual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action "with enough heft to show entitlement to relief . . .

and enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570;

*Iqbal,* 129 S.Ct. 1937, 50 ("While legal conclusions can provide the framework of a complaint,

they must be supported by factual allegations."). The plausibility standard set forth in

*Twombly* and *Iqbal* obligates the plaintiffs to "provide the grounds of [their] entitlement to

relief" through more than "labels and conclusions, [or] a formulaic recitation of the elements of

[their] cause[s] of action," *Twombly*, 550 U.S. at 555. *Plausibility* at the pleading stage is

nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of [the claims] is improbable, and . . . 'recovery is very

remote [or] unlikely.'" *Id.* at 556.

        B.    Claims under Section 11 and Section 12(a)(2)

                *1*    *Elements of a Section 11 Claim*

Suits alleging section 11 violations may be brought by any person who has acquired a

security registered under the 1933 Act, whether in the process of distribution or in the open

8

market. A plaintiff need only prove that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 11 of the Securities Act of 1933, *codified at* 15 U.S.C. § 77k.

For the plaintiffs to state a claim under section 11, then, they must allege that the registration statement contained an untrue statement of material fact or omitted to state a material fact necessary to make the registration statement not misleading. *See, e.g., In re WorldCom Securities Litigation*, 496 F.3d 245 (2d Cir. 2007). Here, the plaintiffs allege in relevant part that: (a) "Prior to and at the time of the IPO, Triton was undergoing severe financial distress and *The Monterey* and *The Rodgers Forge* were also experiencing financial problems. These adverse facts associated with the Triton Loans were negligently omitted from the Registration Statement," Compl. at ¶ 51; (b) the registration statement and prospectus "contained untrue statements of material facts [and] omitted to state other facts necessary to make the statements made not misleading," *id.* at ¶¶ 128, 139; (c) "the Registration Statement contained financial statements that were falsely represented to have been presented in conformity with [GAAP] and SEC accounting rules and regulations, made untrue representations about the Company's mezzanine loan investments, [and] failed to disclose the true risks associated with investing in CBRE," *id.* at ¶ 43; and (d) "at the time of the IPO, the loans to Triton were exhibiting characteristics indicating that an impairment . . . had occurred," *id.* at ¶ 98.

2. *Elements of a Section 12(a)(2) Claim*

Section 12(a)(2) of the Securities Act states in pertinent part:

Any person who offers or sells a security . . . by means of a

9

> prospectus or oral communication, which includes an untrue
> statement of a material fact or omits to state a material fact necessary
> in order to make the statements, . . . not misleading . . . shall be liable
> . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a)(2). To prevail on a claim under section 12(a)(2), the plaintiffs must show that

the defendants offered or sold a security by means of a prospectus or oral communication that

included a material misrepresentation or omission. *Id.* In other words, the same standard applies

to claims brought under section 12(a)(2) as to claims brought under section 11, the difference

being that section 11 pertains to material misstatements and omissions made in a registration

statement while section 12(a)(2) pertains to material misstatements and omissions made in a

prospectus. "Section 12(a)(2) does not require that shareholders purchase their securities during

the initial distribution of shares, but only that plaintiffs 'purchase their shares directly from a

seller who makes use of a false or misleading prospectus.'" *Feiner v. SS&C Tech., Inc.*, 47 F.

Supp. 2d 250, 252 (D. Conn. 1999) (quoting *In Re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d

61, 67 (D. Conn. 1998)).

Here, the complaint alleges that the defendants offered and/or sold CBRE shares pursuant

to a misleading prospectus, and misled investors into purchasing CBRE stock in connection with

and/or traceable to the Company's IPO. Compl. at ¶¶ 138–43. Finally, the Complaint asserts

that "[n]one of the Defendants . . . made a reasonable investigation or possessed reasonable

grounds for the belief that the statements contained in the Prospectus were accurate and complete

in all material respects." *Id.* at ¶ 141.

### 3. *Defendants' Alleged Material Omissions*

The plaintiffs contend that the defendants omitted facts and information regarding risks

that the Triton Loans presented to the health of CBRE from both CBRE's registration statement and from a prospectus pursuant to which the plaintiffs purchased CBRE shares. In turn, the defendants argue that the complaint insufficiently alleges that any defendant was aware of the allegedly materially risky nature of the Triton Loans at the time that either the registration statement or prospectus issued. Accordingly, the defendants argue, the complaint fails adequately to allege violations of sections 11 and 12(a)(2).

Even if the plaintiffs fail to adequately allege that the defendants knew or should have known of the potential impairment of the Triton Loans, the complaint may adequately plead a claim under sections 11 and 12(a)(2). In particular, "Section 11 places a relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). "To state a claim under section 11, an injured plaintiff must allege only that a defendant made or participated in making a 'material misstatement or omission' in a registration statement for a security the plaintiff acquired." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004).

With regard to whether an omission is material, "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," it is material. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal citations omitted); *see also In Re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) ("A misrepresentation or omission . . . is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision.") (internal citations omitted).

The defendants contend that the plaintiffs have not plausibly alleged that the CBRE

11

Registration Statement contained an untrue statement of a material fact or omitted to state a fact

necessary to make the statements therein not misleading

> The complaint states that:

> - As a result of [Triton's] financial distress that began before the IPO, . . . the risk of default associated with CBRE's loans had increased significantly. Compl. at ¶ 70.

> - The Registration Statement . . . contained untrue statements of material facts [and] omitted to state other facts necessary to make the statements made not misleading . . . . *Id.* at ¶ 84.

> - [T]he Registration Statement: (i) contained financial statements that were falsely represented to have been presented in conformity with GAAP and SEC accounting rules and regulations; (ii) made untrue representations about [CBRE's] mezzanine loan investments; (iii) failed to disclose the true risks associated with investing in CBRE; and (iv) otherwise failed to comply with the rules and regulations governing its preparation. *Id.* at ¶ 85.

> - [A]t the time of the IPO, the loans to Triton were exhibiting characteristics indicating that an impairment (i.e., it was probable that CBRE would be unable to collect all amounts due in accordance with the contractual terms of the original loan agreements) had occurred. *Id.* at ¶ 98.

> Furthermore, with regard to impairment of the Triton Loans at or before the time of

the IPO, the plaintiffs allege that:

> - Triton's financial and human capital were greatly extended when it undertook four condominium conversion projects at the same time, including *The Rodgers Forge* and *The Monterey*;

> - Triton was unable to sell condominium units and Triton lacked an effective marketing plan. As a result, it was unable to procure the anticipated and necessary capital to fund its ongoing development efforts;

> - As a result of its inability to sell condominium units, Triton changed the floor plans of individual condominiums in an attempt to spur sales. This change significantly increased the cost of construction and contributed to construction budget overruns;

> - Triton's senior lenders stopped funding their loans when actual construction and capitalized interest costs materially exceeded budget limits;

- Lacking the necessary capital to fund its operations, Triton was unable to timely pay construction contractors. As a result, renovation stalled, undeveloped apartments went vacant and partially converted condominiums went unsold, each of which adversely affected Triton's cash flow and indicated that the risk of default associated with CBRE's loans had increased significantly; and

- On the verge of financial collapse, Triton desperately sought an equity infusion from outside investors, but the equity infusion never occurred.

*Id.* at ¶ 5. The plaintiffs allege in the complaint that Triton was in a precarious fiscal position and that, accordingly, the Triton Loans represented a material risk for CBRE's investors. The complaint, however, fails to allege that, prior to the IPO, CBRE knew of that risk or prospective impairment, or that CBRE should have known (or, through the exercise of due diligence, would have known) of that risk. Whether such knowledge of an alleged material omission is required in a section 11 or a section 12(a)(2) claim was the subject of debate at oral argument, as well as supplemental briefing by the parties.

Recent case law from district courts in this circuit suggests that plaintiffs are required to prove that a defendant securities issuer knew of a material omitted fact in order to be liable for that material omission under section 11 or section 12(a)(2). In *Zirkin v. Quanta Capital Holdings Ltd.*, 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009), Judge Patterson of the Southern District of New York dismissed claims in a putative class action under Sections 11 and 12(a)(2). Writing that "[t]he relevant inquiry under the Securities Act is not whether the estimate disclosed in the offering documents later turned out to be correct, but rather whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue," the Court held that shareholders did not put forth sufficient factual allegations to show that it was plausible that an insurance company's estimate of hurricane losses included in a

prospectus was a material untruth at the time it was made. 2009 WL 185940 at *10. Likewise, in *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008), Judge McMahon wrote that "[a] cognizable claim under Section 11 or 12 of the 1933 Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." 574 F. Supp. 2d at 421 (internal quotation marks omitted) (citing *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) ("No plausibly pleaded fact suggests that [the defendant] knew or should have known of the scope or magnitude of the [alleged] problem at the time of the . . . [o]ffering"); *In re Worldcom, Inc. Securities Litigation*, 2005 WL 638268 at *16 (S.D.N.Y. Mar. 21, 2005) ("Section 11 allows a defendant to avoid liability if he shows that he had no reasonable ground to believe that the expertised portions of a registration statement contained misrepresentations or material omissions") (internal quotation marks omitted); *Castlerock Management Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 (D.N.J. 2000)). The suggestion in *Zirkin*, *Lin*, *In re Worldcom* and *Panther Partners* is that the relevant question under sections 11 and 12(a)(2) is: did the securities issuer know or have reason to know that an offering statement was materially misleading, either because of a misstatement or an omission.

With particular regard to allegations of material omissions, the requirement that a defendant knew or reasonably should have known of the allegedly omitted material fact is a sensible one. A securities issuer may affirmatively mislead purchasers by misstating the truth in a securities offering or by failing to state certain facts that the issuer reasonably expects will lead to misunderstanding; in addition, a securities issuer may purposely fail to diligently ascertain negative facts out of anticipation or fear that those facts would dissuade potential purchasers. In

14

all three of those scenarios – the affirmative misstatement, the knowing omission, or the affirmative avoidance of potentially harmful knowledge – the securities offeror intentionally misleads purchasers through either affirmative misrepresentations or purposeful omission.

On the other hand, if a securities issuer could be held liable for facts the issuer actually and reasonably does not know, the securities laws would hold issuers responsible for unavoidably misleading registration statements or prospectuses – in effect holding securities issuers strictly liable for omissions. Imagine, for instance, that unbeknownst and unknowable to those responsible for preparing a company's registration statement, the company's chief executive were to die in a freak accident as the registration statement went to press. The executive's death would certainly be material to potential investors because the company's past and future success ostensibly depend on the executive; the registration statement, however, omits that key information because there was no reasonable way for it to be included. Holding the issuers liable would be to impose strict liability, essentially faulting the offerors for a lack of omniscience.

Under current prevailing law, however, securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not. Although I am not aware of any Second Circuit decision that discusses whether securities issuers may be liable for material omissions where the issuer neither knew nor reasonably should have known of the omitted facts, the prevailing case law suggests that innocent misstatements, even when the issuer was duly diligent in preparing the securities offering at question, are subject to a strict liability standard. *See, e.g.*, *Herman & Maclean*, 459 U.S. at 282 (due diligence defense is available to other defendants, but "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a

material misstatement or omission to establish his prima facie case. Liability against the issuer

of a security is virtually absolute, even for innocent misstatements."). District courts within and

outside the Second Circuit have taken this approach. *In re Initial Public Offering Securities*

*Litigation*, 544 F. Supp. 2d 277, 290 n.89 (S.D.N.Y. 2008) (citing *Herman & Maclean*); *In re*

*CIT Group, Inc. Securities Litigation*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004) ("As to issuers

the provision imposes a form of strict liability, such that plaintiffs need only show that the

misstatements or omissions were material in order to state a claim.") (internal quotation marks

omitted); *Degulis v. LXR Biotechnology, Inc.*, 1997 WL 20832 at *3 (S.D.N.Y. Jan. 21, 1997)

("[I]n this Circuit there is no serious question that sections 11 and [12(a)(2)] impose strict

liability for materially false statements or omissions. . . . [T]o make out a prima facie case at the

pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither

knowledge nor reason to know is an element in a plaintiff's prima facie case."). Absent

countervailing authority, I am compelled to apply the law as set forth in *Herman & Maclean*.

Where, as here, plaintiffs plead violations of sections 11 and 12(a)(2) based on alleged material

omissions from securities offering statements, those claims are subject to a strict liability

standard and issuers are held liable despite any otherwise available due diligence defense or lack

of knowledge. Accordingly, the plaintiffs need not plead that the defendants knew or should

have known that the Triton Loans were at risk of impairment in order to state a claim for failure

to disclose that risk in CBRE's offering statements.

### 4    Materiality of the Defendants' Alleged Omissions

Assuming, then, that the defendants could be liable for their failure to include information

concerning potential risks of the Triton Loans in CBRE's IPO and prospectus, the plaintiffs must

still adequately plead that any such omission was material. An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Here, for the plaintiffs' allegations to state a claim of material omission in connection with the risk of impairment of the Triton Loans, any prospective failure by Triton to repay CBRE must have the potential to materially alter CBRE's financial health. If, on the other hand, Triton were to default on its loans, but CBRE's bottom line would not be affected, omission of the risk of that default would not be material because the financial vitality of CBRE (and its soundness as an investment) would be unchanged. Put slightly differently, if when CBRE's registration statement and prospectus issued, any Triton default would have made no difference with regard to the merits of investing in CBRE, the risk of that potential default could not have been material. *Panther Partners*, 538 F. Supp. 2d at 668 ("[I]n assessing whether a misrepresentation or omission was material, courts . . . must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued."). To state a claim, then, the plaintiffs must not only plead that the defendants omitted facts pointing to possible default on the Triton Loans; they must also plead that default would have altered the total mix of information available to a reasonable potential investor in CBRE. To do so, the plaintiffs must plead that default on the Triton Loans could have manifested itself as a loss for CBRE. Otherwise, the plaintiffs would fail to plead materiality.

Crucial to the question whether default on the Triton Loans would translate into a loss for CBRE is the related question whether, and to what extent, the Triton Loans were secured by

17

adequate collateral. The Triton Loans totaled approximately $51 million and were secured by The Rodgers Forge and The Monterey. If, at the time that the registration statement and prospectus issued, the value of those properties equaled or exceeded $51 million, CBRE was not at risk. CBRE's investors and creditors would be adequately protected against Triton's possible default in that event, because upon default, CBRE could foreclose on an asset equal to or greater in value than the loans themselves.

"The central inquiry in determining whether a prospectus is materially misleading . . . is . . . whether defendants' misrepresentations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991) (brackets in original). Accordingly, dismissal of a complaint under Rule 12(b)(6) is proper where the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted). *See also Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (materiality lacking in Section 11 allegation where complaint failed "to specify the amounts by which the ferries and containers were allegedly overvalued"); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (complaint failed to plead materiality because it did not "even attempt to approximate the magnitude or degree of those misstatements in relation to Revlon's total financial picture.").

It is not enough for the plaintiffs to allege that, at the time CBRE issued its offering statements, CBRE's financial health possibly could have been worsened by a Triton default. Although such impact might render any potential default material, and would thus render any

18

omission of that potential default material, it would not be enough for a potential Triton default merely to be consistent with such a material omission. The plaintiff's allegations cannot survive the defendants' motion to dismiss only by being consistent with facts that would implicate liability under sections 11 and 12(a)(2), they must plausibly suggest liability. The plaintiffs must set forth "plausible grounds to infer" that their claims of omission rise "above the speculative level." *Twombly*, 127 S. Ct. at 1965.

Neither are various conclusory allegations in the complaint sufficient to plead that alleged omissions were material. The complaint alleges that, although CBRE's registration statement indicated that none of the company's loans were impaired (and defined impairment as the probability that CBRE would be unable to collect all amounts due), "at the time of the IPO, the loans to Triton were exhibiting characteristics indicating that an impairment . . . had occurred." Compl. at ¶¶ 97-98. However, the "adverse facts associated with CBRE's loans to Triton" that the plaintiffs identify do not suggest that the Triton Loans were inadequately collateralized, but instead that the financial health of Triton itself was worsening at the time of the IPO, and that the Monterey and Rodgers Forge construction projects underwent a number of difficulties. *Id.* Although the complaint alleges that "[t]he adverse conditions associated with the Triton properties called into question the viability of Triton, and *The Monterey* and *The Rodgers Forge* and Triton's ability to repay the Company's mezzanine loans," *id.* at ¶ 102, the plaintiffs fail to allege any facts that plausibly suggest that those loans were not secured by sufficient collateral.

In addition, the plaintiffs claim that "CBRE's loans were subject to the undisclosed risk that the Triton Properties were located within a twenty-five mile radius just north of Washington, D.C. . . . and [that] the real estate collateralizing [Triton's] CBRE loans were extremely

19

concentrated geographically and highly subject to the local market's micro-economic and demographic trends." *Id.* at ¶ 109. Without more, though, that allegation does not plausibly suggest a collateral shortfall in the event of Triton's default. The complaint fails to allege that there was any reason to believe that the housing market where the properties are located presented any particular risk that would render the collateral real estate insufficient to cover the Triton Loans if default should occur, let alone at the time of the IPO.

To be clear, the plaintiffs' failure to adequately plead the materiality of the omissions they allege is a failure to allege that, at the time CBRE's registration statement and prospectus issued, any default on Triton's loans would translate into a loss to CBRE. The complaint's fatal defect is not, in contrast, that the plaintiffs pled a potential loss to CBRE that might or might not be material depending on the "total mix" of information available to a reasonable investor, including the relative size of the Triton Loans to CBRE's entire portfolio or other financial information of the company. Courts have at times held that, as a matter of law, the relatively small magnitude of certain losses when compared to a company's investment portfolio renders those losses immaterial. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (overstatement of assets by 2% immaterial as a matter of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 n.26 (1st Cir. 1996) (alleged 3% to 9% overstatement immaterial). *But see SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982) ("[The issue of materiality] is normally a jury question and should not be taken from it unless the Court has engaged in meticulous and well articulated analysis of each item of withheld or misrepresented information."); *Giarraputo v. Unumprovident Corp.*, 2000 U.S. Dist. LEXIS19138, at *45 (D. Me. Nov. 8, 2000) (citing *Seaboard Corp.* for same). I do not now rely on any quantitative benchmarks to assess the

20

materiality of the alleged omissions at issue in this case.

Here, the plaintiffs allege that "CBRE's mezzanine loans approximated 27% of its loans and other lending investments and 20% of its entire investment portfolio." Compl. at ¶ 45. It is unclear, based on the complaint, what percentage of CBRE's mezzanine loans the Triton Loans constituted, or what percentage of CBRE's total portfolio. Again, for the omission of information regarding possible default on the Triton Loans to have been material, any default must have at least made possible a loss to CBRE. If Triton's loans were adequately collateralized, default would not harm CBRE. Without an allegation that CBRE would suffer any loss upon default, the relative size of the Triton Loans in relation to CBRE's other loans or holdings could not form the basis of a finding that the omission of information regarding the risk of default on those loans was material.

C.    Claims under Section 15

Under section 15, which provides for the liability of "controlling persons,"

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11, or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. §77o. For plaintiffs to state a claim under section 15, they must plead (1) control by the Individual Defendants, and (2) an underlying violation of section 11 or 12(a)(2). *Am. High-Income Trust v. Allied Signal*, 329 F. Supp. 2d 534, 549 (S.D.N.Y. 2004). Here, as discussed

21

above, the plaintiffs have failed to adequately plead an underlying violation of sections 11 or

12(a)(2). Accordingly, the plaintiffs' section 15 claim must fail.

## III.   Conclusion

For the reasons discussed above, the defendants' motion to dismiss the Second Amended

Class Action Complaint (**doc. #85**) is GRANTED. The clerk shall close this file.

It is so ordered.


Dated at Bridgeport, Connecticut this ___ day of July 2009.


_____

Stefan R. Underhill
United States District Judge

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PHILIP HUTCHISON, Individually and On
Behalf of All Others Similarly Situated,
SHEET METAL WORKERS, LOCAL NO.
33, ALFRED IVERS, and WEST PALM
BEACH FIREFIGHTERS PENSION FUND,
    Plaintiffs,

    v.

CBRE REALTY FINANCE, INC., KEITH
GOLLENBERG, MICHAEL ANGERTHAL,
and RAY WIRTA,
    Defendant.

CIVIL ACTION NO.
3:07CV1599 (SRU)

## RULING

On July 29, 2009 I granted defendants' motion to dismiss [doc. # 85] plaintiff's second amended complaint [doc. # 79] holding that plaintiffs failed to plead facts sufficient to state a claim for relief under sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77K, 77l(a)(2), and 77o respectively. Specifically, I ruled that plaintiffs did not plead facts demonstrating that defendants made material omissions of fact at the time of CBRE's initial public offering ("IPO"). The judgment entered on August 11, 2009. Plaintiffs timely filed a motion for reconsideration or in the alternative leave to file a third amended complaint [doc. # 105]. For the following reasons, plaintiffs' motion for reconsideration is denied and their motion for leave to file the third amended complaint is also denied.

I.     **Motion for Reconsideration**

    A.     <u>Standard of Review</u>

The standard for granting motions for reconsideration is strict; motions for reconsideration "will generally be denied unless the moving party can point to controlling

decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Motions for reconsideration will not be granted where the party merely seeks to relitigate an issue that has already been decided. *Id.* The three major grounds for granting a motion for reconsideration in the Second Circuit are: (1) an intervening change of controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice. *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478).

     B.    Background

    I assume familiarity with the facts and procedural background of this case. For a detailed discussion of that history, including the factual and legal basis for dismissal, *see Philip Hutchison v. CBRE Realty Finances*, 638 F. Supp. 2d 265 (D. Conn. 2009).

     C.    Discussion

    In the motion for reconsideration the plaintiffs maintain that I overlooked allegations in the second amended complaint concerning the materiality of defendants' alleged omissions. Specifically, plaintiffs claim that I failed to consider the following factual allegations as set forth in the second amended complaint. Triton Real Estate Partners, Inc., the Triton Loans (comprised of the Rodgers Forge Loan and the Monterey Loan) and the properties securing the loans suffered from severe and significant financial difficulties at the time of CBRE's IPO. The market's reaction to the revelation that a default on the Triton Loan was possible despite adequate collateral supported plaintiffs' allegation of materiality. Plaintiffs' claim that the 18% drop in

-2-

stock price after CBRE's February 26, 2007 announcement that it had placed the Rodgers Forge

Loan on its "watch list" supports a claim of materiality. The claim is further supported, plaintiffs

argue, by the fact that nearly six months later the stock price further declined after the August 6,

2007 announcement by CBRE that the Rodgers Forge Loan was non-earning. Additionally,

plaintiffs' suggest that I considered facts outside the complaint, namely the value of the

collateral, in concluding that the omissions and misrepresentations were not material.

Plaintiffs' motion for reconsideration fails for a number of reasons. First, I did consider

the allegedly overlooked facts. *See id.* at 268-69. Second, to the extent that I considered the

value of the collateral, the facts in the second amended complaint clearly represented that the $51

million Triton Loans were backed by the condominium properties. *See* Second Amended Compl.

at ¶¶ 46-47.

To survive a motion to dismiss, plaintiffs must have pled factual allegations sufficient to

raise more than a speculative right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007). To sustain a dismissal of claims under section 11 and 12(a)(2), plaintiffs must have

alleged that "any part of the registration statement, when such part became effective, contained

an untrue statement of material fact or omitted to state a material fact," and that "the prospectus

or oral communication . . . included a material misrepresentation or omission." *See* 15 U.S.C. §§

77k, 77l(a)(2). Plaintiffs alleged in the second amended complaint that the adverse facts

associated with the Triton Loans were negligently omitted from the Registration Statement and

the prospectus. The omission of the adverse facts, plaintiffs claim, was material.

Here, to defeat the motion to dismiss, plaintiffs had to have pled facts supporting that a

default on the Triton Loans would have resulted in a loss to CBRE. In other words, plaintiffs had

to plead that Triton might have been unable to repay CBRE for the Triton Loans, which could have resulted in a loss to CBRE. The possibility of any such loss had to be information that would have been "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). In the ruling on the motion to dismiss, I held that, because the facts as pled failed to permit a finding that the Triton Loans were inadequately collateralized at the time of the IPO, the plaintiffs failed to meet their burden of pleading that at the time CBRE's Registration Statement and prospectus issued any default on the Triton Loans would result in a loss to CBRE. The omission complained of was immaterial in light of CBRE's financial health at the time of the IPO. The facts that plaintiffs claim to have been overlooked were, in fact, considered and a second look at the facts does not alter my previous conclusion. The motion for reconsideration is nothing more than an attempt to relitigate the issue of materiality and is therefore denied.

## II.     Motion for Leave to File Third Amended Complaint

### A.     Standard

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires," and it is within the sound discretion of the district court to grant or deny leave to amend. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-01 (2d Cir. 2007). The district court may deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). For the following reasons, plaintiffs motion to amend is denied.

-4-

B.      Background

Plaintiffs filed their initial complaint on October 30, 2007. The complaint was amended

on March 25, 2008 and corrected on May 6, 2008. Defendants filed a motion to dismiss on July

29, 2008. I heard oral argument on November 14, 2008 and I pressed plaintiffs on the materiality

of any default on the Triton Loans if the loans were adequately collateralized. *See* doc. # 47 at

30-31. The plaintiffs conceded that they had not pled any specific allegations that the Triton

Loans were insufficiently collateralized. At that time I granted plaintiffs an opportunity to

"provide their best shot in the next complaint." *Id.* at 47. On December 22, 2008, plaintiffs

filed their second amended complaint which did not allege a collateral shortfall at the time the

Registration Statement and prospectus issued. I heard oral argument on April 17, 2009 on

defendants' motion to dismiss the second amended complaint (doc. # 85). On July 29, 2009 I

granted the motion. *See Philip Hutchison, et al., v. CBRE Realty Finances, et al.*, 638 F. Supp.

2d 265 (D. Conn. 2009).

C.      Discussion

First, amending the complaint would be futile because the proposed third amended

complaint fails to cure the pleading deficiency concerning materiality that plagued the three

previous iterations. *See In re Helicopter Crash Near Wendle Creek, British Columbia, On

August 8, 2002,* 2009 WL 1391422, *1 (D. Conn. 2009) ("A motion to amend will not be

allowed under Rule 15(a)(2) if it is futile . . . ."). In its proposed third amended complaint,

plaintiffs principally allege that the problems with the Triton Loans were material to investors

despite adequate collateral. In support of that claim, plaintiffs incorporate facts pled in *CBRE

Realty Finance TRS, LLC v. Brian A. McCormick and Charles W. Moore*, 2009 WL 4782124 (D.

-5-

Md. 2009) (hereinafter the "Maryland action"). In the Maryland action, CBRE seeks money damages from McCormick and Moore, guarantors of the underlying loans comprising the Triton Loans. Plaintiffs maintain that CBRE's allegations against McCormick and Moore in the Maryland action support plaintiffs' position that the adverse conditions surrounding the properties backing the Triton Loans were known by CBRE at the time of the IPO and were material to investors.

In the motion for leave to amend, plaintiffs also suggest that I found fatal their failure to plead what percentage the Triton Loans represented of CBRE's total portfolio. Put another way, they suggest that, had I been able to ascertain from the complaint that the Triton Loans represented an appreciable segment of the CBRE portfolio, I would have denied the motion to dismiss. Accordingly, they wish now to plead facts concerning the quantitative and qualitative materiality of the Triton Loans to the CBRE portfolio. The reasoning is flawed. In the July 29, 2009 order, I observed that the "complaint's fatal defect is not . . . that the plaintiffs pled a potential loss to CBRE that might or might not be material depending on the 'total mix' of information available to a reasonable investor, including the relative size of the Triton Loans to CBRE's entire portfolio or other financial information of the company." *See Philip Hutchison v. CBRE Realty Finances*, 638 F. Supp. 2d at 276-77. The complaint's fatal defect was that plaintiffs failed to adequately plead that defendants omitted, at the time CBRE's Registration Statement and prospectus issued, information material to the purchasing decision of a reasonable investor. Because the Triton Loans were adequately collateralized at the time of the IPO, there existed no risk of a loss to CBRE at that time. The facts as pled in the third amended complaint fail once again to rectify the deficiencies concerning the materiality of the omissions

-6-

Leave to amend may be denied where plaintiffs, as in the instant matter, have sought

leave to amend nearly two years after the litigation began. *See Zahra v. Town of Southold*, 48

F.3d 674, 686 (2d Cir. 1995) (upholding the denial of a motion to amend a complaint that was

filed two and one-half years after the commencement of the action). Additionally, the Second

Circuit has instructed district courts to consider the interest in protecting the finality of judgments

and cautioned against district courts providing plaintiffs with what amounts to an advisory

opinion on the efficacy of the proposed amendments. *See Bellikoff v. Eaton Vance Corp.*, 481

F.3d 110, 118 (2d Cir. 2007) ("[W]hen a moving party has had an opportunity to assert the

amendment earlier, but has waited until after judgment before requesting leave, a court may

exercise its discretion more exactingly.") (quoting *State Trading Corp. of India, Ltd. v.*

*Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990)).

Because the plaintiffs were afforded ample opportunity to amend their complaint,

repeatedly failed to cure the defect in the pleading, and cannot demonstrate that the proposed

third amended complaint would survive another motion to dismiss, leave under the

circumstances is not warranted and the motion is denied.

## III.    Conclusion

For the foregoing reasons, plaintiffs' motion for reconsideration or alternatively motion

for leave to amend [doc. # 105] is denied.

It is so ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

-7-

# Exhibit 3

## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

PHILIP HUTCHISON, Individually and On
Behalf of All Others Similarly Situated,
SHEET METAL WORKERS, LOCAL NO. 33,
ALFRED IVERS, and WEST PALM BEACH
FIREFIGHTERS PENSION FUND,
      Plaintiffs,

     v.                                3:07CV1599  (SRU)

CBRE REALTY FINANCE, INC., KEITH
GOLLENBERG, MICHAEL ANGERTHAL,
and RAY WIRTA,
      Defendants.

### J U D G M E N T

      This matter came on before the Honorable Stefan R. Underhill, United States District

Judge, as a result of defendants' motion to dismiss.

      The Court has reviewed all of the papers filed in conjunction with the motion and on July

29, 2009 entered a Ruling on Defendants' Motion to Dismiss, granting defendants' motion.

      Therefore, it is ORDERED and ADJUDGED that judgment is entered for the defendants

and the case is closed.

      Dated at Bridgeport, Connecticut, this 11th day of August 2009.


                         ROBERTA D. TABORA, Clerk

                         By  _/s/ Barbara Sbalbi_____
                                 Deputy Clerk

Entered on Docket _____